George Philler et al., Clearing House Committee of the Clearing House Association, *v.* John J. Patterson, Appellant.

[Marked to be reported.]

*Banks and banking—National bank—Clearing house.*

A clearing house association organized by the national banks of a particular locality merely for the purpose of facilitating the settlement of daily balances between them without involving any element of speculation, or any business undertaking by or on behalf of the associated banks, does not violate the statutes of the United States relating to national banks, or transcend the limits which these statutes have drawn about the business of banking.

Thirty-eight national banks in the city of Philadelphia formed a clearing house association for the settlement of daily balances. A room was hired and fitted up at the expense of the associated banks, and a manager employed who presided over the business of striking the balances every morning at a fixed hour. To facilitate the settlement of daily balances without the necessity for handling and counting the cash in every case, each bank deposited in the hands of certain persons called the Clearing House Committee a sum of money, or its equivalent in good securities, to be used for payment of balances. For these sums the committee issued certificates which were used in lieu of the cash they represented. The

committee was also authorized to receive from any member of the association additional deposits of bills receivable and other securities and issue certificates therefor " in such amount, and to such percentage thereof as may in their judgment be advisable." They agreed to accept the additional certificates, if issued, in payment of daily balances at the clearing house on the condition that the securities deposited therefor should be held by the committee " in trust as a special deposit pledged for the redemption of the certificates issued thereupon." *Held*, (1) that the banks forming such an association did not violate the Federal Statutes, (2) that the committee of the clearing house had a standing to sue on a promissory note deposited with it.

*Promissory note—Accommodation note.*

When an accommodation note has been used by the holder for the purpose for which it was given, the accommodation maker or indorser is bound by the action of his friend, and becomes liable to pay the amount of the note according to its terms. He cannot defend against the indorsee on the ground that the note was without consideration, for to permit this would defeat the purpose for which he loaned his credit.

Argued April 8, 1895.   Appeal, No. 264, Jan. T., 1895, by defendant, from judgment of C. P. No. 1, Phila Co., Dec. T., 1891, No. 599, on verdict for plaintiff.   Before GREEN, WIL- LIAMS, McCOLLUM, DEAN and FELL, JJ.   Affirmed.

Assumpsit on a promissory note.   Before BIDDLE, J.
At the trial it appeared that the note was as follows :

$5,000.                    PHILADELPHIA, February 11, 1891.
" On the 4th day of June, 1891, without grace, I promise to pay to the order of J. F. Bailey, Five thousand dollars, payable at the Spring Garden National Bank, without defalcation, value received.

" JOHN J. PATTERSON.
" Indorsed :—J. F. Bailey," with notarial protest.

The evidence showed that the note was indorsed and delivered to Francis W. Kennedy, who was the president of the Spring Garden National Bank.   The Spring Garden National Bank was a member of the Clearing House Association of the Banks of Philadelphia.   In November and December, 1890, the clearing house committee advanced to the Spring Garden National Bank over $400,000 in the form of loan certificates. These advances were made on the faith of collateral securities then held by the committee, consisting of promissory notes

and of other securities, which were deposited by the Spring Garden Bank with the clearing house committee at the time the advances were severally made, and which were approved solely by the committee. In February, 1891, the committee held, amongst other security for the payment of this indebtedness, $116,077 of promissory notes then about to mature, which on Feb. 17, 1891, at the request of the Spring Garden National Bank, the committee delivered to that bank, and in consideration therefor received from the bank other promissory notes amounting to $116,081, which included the note in suit.

The following offers of testimony by defendant with objections and rulings of the court were made during the trial.

" The defendant offers to prove by John J. Patterson, a witness on the stand, that prior to Dec. 3, 1887, defendant and J. F. Bailey borrowed from Nelson F. Evans and Francis W. Kennedy $17,500, and as collateral security for the repayment thereof deposited with them $27,500 of the Second Mortgage Bonds of the Bloomington and Normal Horse Railway Company ; that on Dec. 3, 1887, defendant with Bailey sold out their equity in said bonds for $5,000 to said Evans, and the said Kennedy assuming to pay the loan of $17,500 hereinbefore mentioned, and as part of this transaction Kennedy and Evans represented that it would be necessary for deponent to make and Bailey to indorse a note for $5,000, so as to carry the loan of that amount until it would be convenient for Kennedy and Evans to pay it off, which they said would be done within the next six months ; that this, however, was not done, and on the maturity of the first note Francis W. Kennedy informed witness that he had been unable to pay off the loan, but requested defendant to make and Bailey to indorse a new note for a like amount, which was to be used to enable Kennedy and Evans to carry said loan, and thus the note continued to mature and be renewed on similar statements made by Kennedy down until the making of the note in suit, which occurred on Feb. 11, 1891, on or about which date said Kennedy stated to defendant that he had been unable to pay off said loan of $5,000, and requested defendant to make and Bailey to indorse the note in suit, to be applied by him in carrying the said loan of $5,000, and, relying on the truthfulness of those statements, defendant made and Bailey indorsed the note in suit and delivered the same to

said Francis W. Kennedy for the purposes aforesaid ; that said statement was untrue, and was fraudulently made by the said Kennedy to witness to deceive and defraud him, and to enable the said Kennedy to obtain the said promissory note, and use the same for his own general purposes, and not for the purpose stated when the note was made and indorsed and delivered to him, and that at the time of making and delivery of the note in suit to said Kennedy he was the president of the Spring Garden National Bank and its chief executive officer.

" Objected to, because the defendant has already proved that the plaintiffs are bona fide holders for value, having given a full and valuable consideration for the note, and that the facts, if proved, would be no defense to the action.

" Objection sustained.   Exception to defendant. [1]

" Defendant offers in evidence blank loan certificate of the clearing house committee of the Philadelphia banks, and states that he proposes to follow it up by proof showing that certificates in this form were issued to the Spring Garden National Bank to the aggregate of $400,000 in December, 1890 ; that as collateral security for the certificates above referred to the Spring Garden National Bank, among other collaterals, deposited with the Clearing House Association a promissory note made by John J. Patterson to the order of J. F. Bailey, indorsed by J. F. Bailey and dated Sept. 13, 1890, wherein the maker promised to pay to the order of the indorser on the 31st of January, 1891, $5,000 ; that after the maturity of this note, to wit, on the 17th day of February, 1891, the Spring Garden National Bank brought the note in suit to the Clearing House Association and deposited it as substituted collateral for the note of like amount due on the 31st of January, 1891.

" Plaintiff objects, first, because the paper which is offered in evidence is not the paper which is described in the offer of proof, as the paper offered in evidence is a certificate of the clearing house committee and not by the banks as recited in the offer ; and, secondly, because the evidence is immaterial and irrelevant unless it is coupled with an offer to prove a defense to the payment of the note itself.

" Objection sustained.   Exception to defendant." [2]

The material portions of the constitution and by-laws of the Clearing House Association are as follows :

" ARTICLE 1. The title of this association shall be the Clearing House Association of the Banks of Philadelphia.

" ARTICLE 2. Its object shall be to effect at one place the *daily exchanges* between the several associated banks . . . . and the payment at the same place of the balances resulting from such exchanges.    The responsibility of the association for such exchanges is strictly limited to the faithful distribution by the manager among the creditor banks for the time being of the sums actually received by him, and should any losses occur while the said balances are in the custody of the manager, they shall be borne and paid by the associated banks in the same proportion as the expenses of the Clearing House, as hereinafter provided for.

" ARTICLE 3. Each bank belonging to the association may be represented at all meetings thereof by the *president*, vice-president, or cashier, or by such other person as the board of directors shall appoint." . . . .

" ARTICLE 5. At the stated meeting in the month of January, annually, a standing committee of six bank officers shall be elected by the majority, and by ballot, to be called the Clearing House Committee, whose duty it shall be to procure from time to time a suitable room or rooms for the Clearing House, to provide proper books, stationery, furniture, fuel, and whatever else may be necessary for the convenient transaction of business thereat, to appoint a manager annually, to establish rules and regulations to be observed at the Clearing House in cases not provided for in these articles, subject to the approval of the association, and generally to supervise the Clearing House affairs.    This committee shall have charge of the funds belonging to the association, shall draw on each bank for its quota of expenses, and shall at the stated meetings in April and October submit detailed accounts of expenditures and estimates of what may be required for the Clearing House the ensuing half year.

" This committee shall take into their separate custody the collateral securities required to be deposited with them by the banks, members of the association, under the provisions of article XVII., and receipt therefor, and for any exchange of such collateral securities."

" ARTICLE 9. The hour for making the morning exchange at

the Clearing House shall be at eight and a half o'clock A. M. precisely; between the hours of eleven and twelve o'clock the debtor banks shall pay to the manager at the Clearing House the balances against them, in such certificates as are or may be from time to time authorized by the Clearing House Association, or in the certificates hereinafter mentioned except fractional amounts, which shall be paid in Clearing House due bills. At twelve and a half o'clock the creditor banks shall receive from the manager at the same place, the respective balances due to them, provided the balances due from the debtor banks shall have been paid."

"ARTICLE 13. The Clearing House Association of the Banks of Philadelphia shall receive on deposit, in special trust, such United States gold coin as any of the associated banks may choose to send to it for safe keeping, for Clearing House purposes, which coin shall be kept in the safe or safes belonging to the association in the vault or vaults of the Farmers' and Mechanics' National Bank of Philadelphia.

"Certificates in exchange for such coin shall be issued to the depositing banks in sums of $5,000; said certificates shall be signed by the manager of the Clearing House Association or by his assistant, or other person designated by the association for the purpose, and shall be countersigned by the president, acting president, cashier, or assistant cashier of the Farmers' and Mechanics' National Bank of Philadelphia. Such certificates shall be negotiated only among the associated banks, and shall be received by them in payment of balances at the Clearing House. Such special deposits of coin are to be entirely voluntary—each bank being left perfectly free to make them or not at its own discretion.

"The coin thus placed in special deposit is to be the absolute property of such of the associated banks as shall from time to time be the holders of the certificates, and is to be the depository, subject to withdrawal on presentation of the properly indorsed certificates at any time during banking hours."

"ARTICLE 17. Each bank, member of the Clearing House Association, shall deposit security with the Clearing House Committee as collateral for their daily settlements in the following percentage or assessment on capital. . . . .

"The committee shall apply the deposit of any defaulting

bank to the payment of the balance due by such bank at the Clearing House, or to the reimbursement *pro rata* of the several banks furnishing said balance, under article XI., and the surplus, if any, shall be held as collateral security for other indebtedness to members of this association."

The agreements under which the certificates were issued in 1873 and also in 1890 were as follows:

## " CLEARING HOUSE ASSOCIATION OF PHILADELPHIA.

*"Agreement of September 24th,* 1873, *as Amended October 18th,* 1873.

"For the purpose of enabling the banks, members of the Philadelphia Clearing House Association, to afford proper assistance to the mercantile and manufacturing community, and also to facilitate the inter-bank settlements resulting from their daily exchanges, we, the undersigned, do bind ourselves by the following agreement on the part of our respective banks, viz. :—

"*First.*—That the Clearing House Committee be, and they are hereby authorized to issue to any bank, member of the association, loan certificates bearing six per cent. interest on the deposits of bills receivable and other securities to such an amount and to such percentage thereof as may in their judgment be advisable.

"These certificates may be used in settlement of balances at the Clearing House, and they shall be received by creditor banks in the same proportion that they bear to the aggregate amount of the debtor balances paid at the Clearing House. The interest that may accrue upon these certificates shall be apportioned monthly among the banks which shall have held them during that time.

"*Second.*—The securities deposited with the said committee shall be held by them in trust as a special deposit, pledged for the redemption of the certificates issued thereupon, the same being accepted by the committee as collateral security, with the express condition that neither the Clearing House Association, the Clearing House Committee, nor any member thereof, shall be responsible for any loss on said collaterals arising from failure to make demand and protest, or from any other neglect

or omission, other than the refusal to take some reasonable step which the said depositing bank may have previously required in writing.

"*Third.*—On the surrender of such certificates, or any of them, by the depositing bank, the committee will indorse the amount as a payment on the obligation of said bank held by them, and will surrender a proportionate amount of securities, except in case of default of the bank in any of its transactions through the Clearing House, in which case the securities will be applied by the committee, first, to the payment of outstanding certificates, with interest; next to the liquidation of any indebtedness of such bank to the other banks, members of the Clearing House Association.

"*Fourth.*—The committee shall be authorized to exchange any portion of said securities for others, to be approved by them, and shall have power to demand additional security, at their own discretion.

"*Fifth.*—That the Clearing House Committee be authorized to carry into full effect this agreement, with power to establish such rules and regulations for the practical working thereof as they may deem necessary, and any loss caused by the nonpayment of loan certificates shall be assessed by the committee upon all the banks in the ratio of capital.

"*Sixth.*—The expenses incurred in carrying out this agreement shall be assessed upon the banks in equal proportion to their respective capital.

"*Seventh.*—That the Clearing House Committee be and they are hereby authorized to terminate this agreement upon giving thirty days' notice thereof, at any stated meeting of the Clearing House Association."

"PHILADELPHIA, November 18th, 1890.

"At a meeting of the Clearing House Committee, held this day, it was, on motion—

"*Resolved*, That in accordance with resolutions of September 24th, 1873, as amended October 18th, 1873, the Clearing House Committee will issue loan certificates to banks applying and receive them in payment of balances.

(Signed)     "JOHN C. BOYD,

"*Manager.*"

The form of loan certificate issued under the foregoing agreement was as follows:—

"No. 9601.                                        $5000.

"CLEARING HOUSE COMMITTEE OF THE PILADELPHIA BANKS, PHILADELPHIA.

"*This certifies*, that the .............................. has deposited with this committee, securities in accordance with the agreement of a meeting of bank officers, held September 24th, 1873. This certificate will be received during the continuance of said agreement, and of any renewals of the same, in payment of balances at the Clearing House for the sum of FIVE THOUSAND DOLLARS, only from a member of the Clearing House Association, to whom the same may have been issued, or to whom it may be indorsed by the manager of the Clearing House.

LOAN CERTIFICATE.

On the surrender of this certificate by the depositing ........................ bank above named, the committee will indorse the amount as a payment on the obliga- ........................ tion of said bank held by them, and surrender a proportionate amount of the col- ........................ lateral securities; except in case of default on the part of said bank in its transactions ....................... through the Clearing House Association of Philadelphia. ........................

COMMITTEE.

INDORSED :—
Paid to the Clearing House.

DATE OF INDORSEMENT.      By .....................

To .....................

To ......................"

Plaintiffs' point was as follows:

" 1. Under the evidence in this case your verdict should be for the plaintiffs. *Answer:* Affirmed." [4]

Defendant's points were as follows:

" 1. That under the statute of the United States known as the National Bank Act the plaintiffs cannot maintain this action. *Answer:* Refused. [5]

" 2. The undisputed evidence in this cause shows that the Clearing House Association of the Banks of Philadelphia is composed of banks incorporated under the provisions of the statute of the United States known as the National Bank Act and its supplements, and that under the provisions of that statute there is no authority to maintain the pending action. *Answer:* Refused. [6]

" 3. The undisputed evidence in this case shows that the Clearing House Association of the Banks of Philadelphia is composed of national banks incorporated under the provisions of the statutes of the United States in reference to national banks, and that the pending suit is brought by the plaintiffs in their capacity as the clearing house committee of said association and for the use and benefit of said association; that there is no authority under the provisions of the aforesaid statute of the United States or otherwise to maintain the present action either in the name of the Clearing House Association of the Banks of Philadelphia or in the names of the respective plaintiffs, being the Clearing House Committee of the Clearing House Association of the Banks of Philadelphia. *Answer:* Refused. [7]

" 4. That under the evidence in this case and the statutes governing national banks the plaintiffs cannot maintain the pending action against the defendant. *Answer:* Refused. [8]

" 5. That under all the evidence in this cause the verdict must be for the defendant. *Answer:* Refused." [9]

The court charged as follows:

" [The only question in this case is a question of law, which is a matter that I have to decide. As far as you are concerned the note is there which it is admitted has never been paid. Under those circumstances, of course, your verdict will be for the plaintiffs. I affirm the plaintiffs' point and refuse the points of the defendant.] " [3]

Verdict and judgment for plaintiffs for $5,997.   Defendant appealed.

*Errors assigned* were (1, 2) rulings on evidence, quoting the bill of exceptions; (3–9) instructions as above, quoting them.

*M. Hampton Todd,* for appellant.—Before the holder of a negotiable promissory note, which has been obtained by fraud or misrepresentation and proof thereof made, can recover on it, he must show that he is the holder of it for value before maturity without notice, and in this case the defendant having proved or offered to prove, which is the same thing, that the note was fraudulently obtained, he thereby shifted the burden to the plaintiffs of proving that they were such holders for value before maturity without notice: Lerch Hardware Co. v. Bank, 109 Pa. 240.

There is no authority under the provisions of the national bank act for the national banks forming the Clearing House Association of Philadelphia to enter into the agreement of Sept. 24, 1873, as amended Oct. 18, 1873, and repromulgated Nov. 18, 1890; nor was there any authority in said Clearing House Association, either directly or acting through its governing committee, the plaintiffs in this action, to issue the $400,000 of loan certificates in this case to the Spring Garden National Bank, or to receive and hold collateral securities, and especially the note in suit, from the Spring Garden National Bank to secure the repayment by the said bank of the amount of said certificates to the holders thereof with interest; nor has the said associated banks, either directly in their own name, or indirectly through the instrumentality of their governing committee for the use of said associated banks, a right to maintain an action on the note in suit against the defendant; nor can such Clearing House Association, or its committee, become a bona fide holder for value thereof.   In short, it has no authority in law to purchase the note in suit or to maintain an action upon it.   We submit that the issuance of these loan certificates, and the receipt of collaterals to secure their payment with interest, are without authority of law and absolutely void.

If such an association is beyond the powers of such national banks, then the association, directly or indirectly, cannot main-

tain an action on the certificates of loans issued in pursuance of said agreement, or on the collaterals deposited as security for the certificates of loan : Central Transportation Co. v. Pullman's Car Co., 139 U. S. 24.

*A. T. Freedley*, for appellee.—The maker of a promissory note cannot escape payment of his obligation by alleging that the act whereby a subsequent holder acquired it for value was an act ultra vires of the holder's chartered powers : National Bank v. Matthews, 98 U. S. 628; National Bank v. Whitney, 103 U. S. 102; Swope v. Leffingwell, 105 U. S. 3; Reynolds v. Crawfordsville Bank, 112 U. S. 413 ; Casey v. Credit Mobilier, 2 Woods, 86; Wright v. Pipe Line Co., 101 Pa. 204; Pine Grove Twp. v. Talcott, 19 Wall. 678; Sedgwick's Statute and Constitutional Law, 90 ; Kingman County v. Cornell University, 12 U. S. App. 559.

If the loan certificates were directly issued by a bank such issuance would not be ultra vires. It is a dealing on the faith of promissory notes, which is the very business for which banks are established : O'Hare v. Second Nat. Bank, 77 Pa. 97 ; Casey v. Credit Mobilier, 2 Woods, 86 ; Wright v. Pipe Line Co., 101 Pa. 202.

The point that the committee are not entitled to sue, as not being the absolute owners of the note, is without foundation. They held the note, and they have the legal title thereto. In an action on a negotiable instrument any holder is entitled to sue : Logan v. Cassell, 88 Pa. 290 ; Pearce v. Austin, 4 Whart. 489 ; Holmes v. Paul, 6 Am. Law Reg. 482; Brown v. Clark, 14 Pa. 469; Ward v. Tyler, 52 Pa. 393; Ballentine v. Mc-Geagh, 4 Brewst. 95.

OPINION BY MR. JUSTICE WILLIAMS, May 29, 1895 :

Two lines of defense were taken in this case in the court below. The first of these denied the capacity of the plaintiffs to sue, and was brought to the attention of the learned judge by a prayer for instructions to the jury " that under the evidence in this case and the statutes governing national banks the plaintiffs cannot maintain the pending action against the defendant." The second alleged that the note sued on was made for the accommodation of F. W. Kennedy, president of the Spring Gar-

den National Bank, and that the plaintiffs were chargeable
with notice of the want of consideration as between the maker
and F. W. Kennedy. The first of these lines of defense makes
it important for us to consider and determine the character and
objects of the Clearing House Association, the distinction to be
taken between it and the clearing house, and the functions and
powers of the clearing house committee. An examination of
the constitution or articles of association adopted by the banks
forming " The Clearing House Association of the Banks of
Philadelphia " shows the character and objects of the organiza-
tion very clearly. In substance these articles amount to an
agreement with each other by thirty-eight national banks in
the city of Philadelphia to facilitate and simplify the settlement
of daily balances between them for their mutual advantage.
This agreement substitutes a settlement made at a fixed place
and time each day by representatives of all the members of the
association, in the place of a separate settlement by each bank
with every other made over the counter. No other object is
contemplated or provided for. The association does not pro-
vide for any united action for any business purpose. It does
not contemplate the employment of capital or credit in any
enterprise. It proposes and provides for co-operation to expe-
dite and simplify the transaction by each member of the asso-
ciation of its own proper business in one particular, viz, the
settlement of daily balances with the other national banks
doing business in the city. Incidentally, co-operation in this
particular would tend to bring the banks belonging to the
association into closer relations, enable them to become more
familiar with the volume of business and the actual condition
of each other, and open the way to make them mutually helpful
in times of financial stringency ; but these results are incidental
only. The Clearing House Association is nothing more nor
less than an agreement among thirty-eight national banks to
make their daily settlements at a fixed time and place each
day. To carry this agreement into operation it became neces-
sary to determine the place and hour at which the settlement
should be made. A suitable room was secured, fitted up with
desks and other necessary appliances at the expense of the
associated banks, and a manager chosen to preside over it and
direct the action of the clerks and runners when in session.

This room is the clearing place or, in the language of the constitution of the association, the clearing house.  It is the place where the representatives of the several banks meet, and where all balances are struck and settled daily between the banks composing the association.

At the close of each meeting the amount due to and from each bank is definitely ascertained.  The debtor banks then pay over to the manager the gross balance due from them to settle their accounts with all the members of the association, and he makes distribution of the sum so received among the creditor banks entitled to receive them.  The clearing house is therefore not a business organization, a corporation, a partnership or an artificial person of any sort, but a place in which the thirty-eight members of the association settle with each other daily.  We come now to consider the committee and the position in the general scheme occupied by it.  Among the economies in time and labor contemplated by the banks was a settlement of daily balances without the necessity for handling and counting the cash in every case.  To provide for this the banks agreed that they would deposit in the hands of certain persons, to be selected by them and to be called the clearing house committee, a sum of money, or its equivalent in good securities, at a fixed ratio upon their capital stock, to be used for payment of balances against them.  For these sums the committee was to issue receipts or certificates in convenient sums, and these receipts or certificates were to be used in lieu of the cash they represented, which remained in the hands of the committee pledged for the payment, when payment became necessary, of the certificates.  The committee held the funds and securities deposited with them in trust for the special purpose of securing the payment as far as they would reach of the balances due from the bank making the deposit.  On Sept. 24, 1873, the associated banks entered into another agreement with each other by which " for the purpose of enabling the banks, members of the Philadelphia Clearing House Association, to afford proper assistance to the mercantile and manufacturing community and also to faciliate the inter-bank settlements resulting from the daily exchanges," they authorized the committee to receive from any member of the association additional deposits of bills receivable and other securities and issue certificates therefor " in

such amount, and to such percentage thereof as may in their judgment be advisable." The additional certificates, if issued, they agreed to accept in payment of daily balances at the clearing house on the condition that the securities deposited therefor should be held by the committee "in trust as a special deposit pledged for the redemption of the certificates issued thereupon." The committee were made, both by the original articles of association and by the additional contract of 1873, trustees or agents for all the members of the association with authority to accept deposits in money or securities and to issue their own receipts therefor, the money or securities remaining in their hands in pledge for the redemption of the receipts or certificates so issued by them. When a bank to which certificates had been issued under the original plan or the contract of 1873 failed to redeem them when their redemption became necessary, it was the duty of the committee to collect the securities in their hands and apply the proceeds to the payment of the holders of the certificates. The deposits were made, and the certificates issued, under an unconditional pledge of the securities to the committee for the payment of the certificates, and their title could only be divested by the payment of the sums for which the securities were pledged. The entire plan on which the settlements are made is therefore a device adopted by the banks to facilitate their legitimate business as banks, and involves no element of speculation, and no business undertaking by or on behalf of the associated banks. We are unable therefore to see in what respect these banks have violated the statutes of the United States relating to national banks or have transcended the limits which these statutes have drawn about the business of banking. They have diverted none of their funds, embarked in no new undertaking, entered into no business alliance, but devised and adopted what seems to be an improved method for doing a portion of their own necessary work. This same method or one identical in general outline has been adopted by the banks in every great city in the United States and by many in other lands ; and, as far as I am aware, it has nowhere been held that the method is illegal. On the contrary it has recommended itself by its economy of time and labor to the several banks and, by its incidental results in promoting mutual helpfulness and confidence, has come to be regarded

with favor by the general public.    The first line of defense was therefore properly held to be untenable by the court below and the assignment of error to that ruling cannot be sustained. The second line fails with the first.    If it was not a violation of law for the banks to arrange for their own daily settlements in the manner provided by the clearing house agreement, then the committee became holders for value of the securities deposited with, and receipted for by them, and as such are not affected by equities existing between the original parties to the promissory notes or other negotiable securities for which they have issued certificates.    But if they could be regarded as fixed with notice of the character of the note it is not easy to see how the fact that the note now sued on was made for the accommodation of F. W. Kennedy can avail the defendant.    The committee are certainly holders for value and hold the note in pledge for the payment of its face in cash.    Let us suppose they knew when they took it that it had been made and delivered to Kennedy for his accommodation.    The very object of making an accommodation note is that the person for whose accommodation it was made may use it in the way that will best accommodate him.    When it has been so used by the holder the accommodation maker or indorser is bound by the action of his friend and becomes liable to pay the amount of the note according to its terms: Moore v. Baird, 30 Pa. 138 ; and he cannot defend against the indorsee on the ground that the note was without consideration, for to permit this would defeat the purpose for which he loaned his credit: Cozens v. Middleton, 118 Pa. 622.    As against a holder for value an accommodation maker can defend only on the ground of actual payment.    The fact that it was without consideration and made for the accommodation of him who negotiated it is immaterial: Miller v. Pollock, 99 Pa. 206.    Accommodation indorsers often show the character of their indorsement by a direction made upon the face of the note to credit the proceeds to the drawer, but the fact that the bank discounting had notice that the indorser was lending his credit to the maker has never been thought to affect the bank, or to relieve the indorser.

The evidence offered at the trial to show that the note was without consideration and given for the accommodation of F. W. Kennedy, by whom it was used in exactly the manner that must

have been contemplated when it was given, was properly re jected. It might have been competent if the action had been brought by Kennedy but as against a holder for value it was inadmissible. This question was ruled in the very recent case of Philler et al. v. Jewett, decided at the present term.

The judgment is now affirmed.