Union Bank and Trust Co., to use, *v.* Girard Trust
Co., Appellant.

Argued January 26, 1932.  Before Frazer, C. J., Simpson, Kephart, Schaffer, Maxey, Drew and Linn, JJ.

490

*John Hampton Barnes,* with him *Theodore Voorhees,* for appellant.—The payment was made by the bank acting through its duly authorized officers.

The purchase by McCullough cannot raise a liability on the part of defendant.

The due bill was the equivalent of cash, and one who receives a payment in cash is not under a duty to inquire: Crane, Parris & Co. v. Bank, 173 Pa. 566; Yardley v. Philler, 167 U. S. 344; Holly v. Missionary Society, 180 U. S. 284.

Under the Uniform Fiduciaries Act there was no duty to inquire if defendant acted in good faith: Norristown-Penn Trust Co. v. Middleton, 300 Pa. 522; Johnson Co. Bank v. Koch, 38 Pa. Superior Ct. 553; Moorehead v. Gilmore, 77 Pa. 118; Detroit Savings Banks v. Towers, 42 Pa. Superior Ct. 246; Second Nat. Bank v. Morgan, 165 Pa. 199; Lancaster Co. Bank v. Garber, 178 Pa. 91.

The action does not lie against the defendant: Girard Trust Co. Morgan's Estate, 2 Pa. Dist. R. 816; Prager v. Gordon, 78 Pa. Superior Ct. 76.

*Robert T. McCracken,* with him *George G. Chandler* and *James McMullan,* for appellees.—The evidence fully sustains the finding that appellant specifically demanded and received $280,000 out of the funds of Union Bank

and Trust Company in payment of a known private and personal obligation of its president and without any inquiry: Tinius Olsen T. Mch. Co. v. Wolf, 297 Pa. 153; Athens Nat. Bank v. Twp., 303 Pa. 479.

The trial court committed no error in concluding that appellant was under a duty of inquiry as to the right and authority of McCulloch to use corporate funds of Union Bank and Trust Company in order to pay his known private and personal obligation: Norristown-Penn Trust Co. v. Middleton, 300 Pa. 522; Fehr v. Campbell, 288 Pa. 549; Schmitt v. Potter Trust Co., 61 Pa. Superior Ct. 301; Odd Fellows Home v. Velenchick Bros., 73 Pa. Superior Ct. 153.

What gives rise to a duty of inquiry in the due bill transaction is the use of bank funds by a bank officer to pay his personal creditor; and this important fact is uterly lacking in the check transaction, even though it be certified: Schmitt v. Bank, 67 Pa. Superior Ct. 453.

Custom cannot be invoked in order to defeat a duty of inquiry where bank or corporate funds are directly used by an officer in payment of his private indebtedness, has been uniformly held and applied in every case where that defense has arisen: Norristown-Penn Trust Co. v. Middleton, 300 Pa. 522.

The Uniform Fiduciaries Act does not preclude duty of inquiry if appellant acted in good faith: Fehr v. Campbell, 288 Pa. 549; Norristown-Penn Trust Co. v. Middleton, 300 Pa. 522.

The trial court correctly held that the present suit was properly brought against Girard Trust Company in its corporate capacity: Prager v. Gordon, 78 Pa. Superior Ct. 76; Morgan's Est., 2 Pa. Dist. R. 816; Braman's App., 89 Pa. 78.

*Joseph J. Brown,* for Frederick M. Mitchell, coexecutor of estate of Henry F. Mitchell, deceased.—The present case presents a situation which is provided for by section 5 of the Uniform Fiduciaries Act of May 31,

1923, P. L. 468, and must be decided in accordance with the rules therein prescribed.

In order to establish "bad faith" upon the part of the Girard Trust Company within the meaning of that term as used in section 5 of the Uniform Fiduciaries Act, the circumstances must warrant the inference that in taking the due bill in controversy, it actually knew or in fact suspected that there had been some breach of fiduciary obligation in connection with its issuance or delivery: Lancaster Co. Nat. Bank v. Garber, 178 Pa. 91; Phelan v. Moss, 67 Pa. 59; Second Nat. Bank v. Morgan, 165 Pa. 199; McSparran v. Neely, 91 Pa. 17; Johnson Co. S. Bank v. Koch, 38 Pa. Superior Ct. 553.

OPINION BY MR. JUSTICE LINN, May 26, 1932:

The use-plaintiff sues to recover back the proceeds of a clearing house due bill issued by the legal plaintiff (here called Union Bank) and paid through the clearing house. Defendant contends (1) that it took the due bill for value without actual knowledge of invalidity, or knowledge of facts imputing bad faith; (2) that if the due bill was invalid when issued, the transaction was subsequently ratified; (3) that, in any event, as defendant was acting with another as coexecutor in receiving the due bill, the defendant alone is not liable. We need consider only the first defense.

Plaintiff declared and presented its case on the theory that, as defendant requested McCulloch to pay for the stock sold to him with a clearing house due bill, defendant was bound to inquire of the bank (because McCulloch was president) whether he had paid for the due bill, or had obtained it dishonestly.

The case was tried by a judge without a jury pursuant to the Act of 1874; he made findings of fact, conclusions of law, and entered judgment for the plaintiff for $321,-066.67. He held "that there is a duty of inquiry, whenever bank funds are taken in payment of a known private obligation of a bank officer"; that if defendant had

made inquiry it would have ascertained that the president, McCulloch, was improperly using the funds of the bank to pay his personal debt, and that defendant must be considered as having received the due bill with knowledge of that breach of trust and must therefore reimburse plaintiff. Defendant appeals.

On the undisputed relevant facts, the judgment must be reversed. In order that the facts may fully appear to show the theory of appellee, we state them substantially as given in appellee's brief, slightly condensing the statement. On March 18, 1929, Frederick M. Mitchell, coexecutor of the Henry F. Mitchell estate, telephoned Brown, counsel for the estate, that he had an offer from McCulloch to buy 700 shares of Union Bank stock owned by the estate, and asked him to negotiate with McCulloch. Brown telephoned Bishop, vice-president of defendant, coexecutor, told him of the offer, and procured authority to represent the estate in the transaction. McCulloch, then president of Union Bank, told Brown that he wished to buy the stock personally and expected to make a profit out of it, "had a deal on," and offered $300 a share. Later that day, Brown received an offer of $350 per share from E. B. Smith & Company, and after McCulloch had increased his bid to meet this offer, E. B. Smith & Company made a firm offer of $400 per share. On March 19th, when advised of this offer, McCulloch told Brown that he would take the stock at that price, and inquired how long it would be before he would have to pay for it; Brown answered he thought McCulloch would have almost ten days. A purchase and sale memorandum was signed by McCulloch and Brown dated March 19th. On March 25th, Bishop advised Brown that the stock had been delivered and paid for and the $280,000 had been entered on defendant's books to the credit of Mitchell estate.

"On March 21, 1929 [we quote from appellee's brief], the grand jury report condemning Union Bank for its business dealings with alleged bootleggers and a rum-

ring was given the fullest publicity in the Philadelphia newspapers; and on that day defendant sent a messenger to Harrisburg to obtain the transfer waiver and wrote McCulloch a letter stating that the stock would be delivered the next morning by messenger at 10 o'clock and requesting payment therefor upon delivery by a certified check, bank check or clearing house due bill for $280,000 to the order of the Mitchell estate or Girard Trust Company, as he preferred."

On March 22d, defendant's messenger delivered the stock to McCulloch with proper transfer letter demanding payment for the stock by a clearing house due bill for $280,000 to the order of the Mitchell estate or Girard Trust Company, as McCulloch preferred. McCulloch handed the stock and letter to Frederick Fairlamb, vice-president and treasurer of Union Bank and instructed him to make payment for the stock with a clearing house due bill in accordance with the letter. McCulloch told Fairlamb at the time that he had arranged for a loan to take up and make good the clearing house due bill, which loan he would receive that day. Fairlamb understood that the loan was not with the Union Bank and McCulloch made no arrangement for a loan with that bank.

Fairlamb prepared and signed a brown ledger charge to be held by the note teller as memorandum charge or counterbalancing item for the issuance of the due bill and delivered it to W. B. Burton, note teller of Union Bank with instructions to make out a clearing house due bill for $280,000 to Girard Trust Company. Burton then made out the due bill, and delivered it to the messenger of defendant. Fairlamb then handed the stock to McCulloch. Fairlamb was not a director of Union Bank and had no authority to issue the due bill. No money was received from McCulloch on that day or later to take up the charge and the due bill was entered and thereafter carried as a cash item in an account known as "city checks and other cash items." The due bill was

paid to defendant through the clearing house out of funds of Union Bank. On March 22d, the 700 shares of stock were transferred out of the Mitchell estate into the name of Joseph S. McCulloch.

On March 28, 1929, Union Bank assigned and transferred its property and assets to Corn Exchange National Bank and Trust Company, use-plaintiff, for liquidation purposes. About April 1, 1929, Fairlamb told McCulloch that he ought to give Burton something as a better memorandum than the brown ledger charge which bore only Fairlamb's signature; McCulloch then made and delivered to Fairlamb a demand promissory note for $280,000 to the order of "Myself," endorsed in blank by McCulloch. Fairlamb in turn delivered the note to Burton; and the same has since been carried in the note teller's department as cash. The brown ledger charge was thereupon destroyed by Fairlamb. McCulloch never arranged for a loan with Union Bank; and the McCulloch note was never authorized or formally ratified by the directors or the finance committee of Union Bank; nor was a loan of $280,000 to McCulloch ever authorized by the directors or finance committee of Union Bank.

On April 11th, McCulloch delivered the new certificates of stock standing in his name to John W. Frank, assistant treasurer of Union Bank with loose powers of attorney for transfer in blank attached; he delivered them to Burton who placed them with the note and carried both as cash in the note teller's department.

The due bill is in the following form: "Clearing House Due Bill. Union Bank and Trust Company of Philadelphia. March 22, 1929, 19. Due by Union Bank and Trust Company No. B. 2975. to —3-48. The sum of $280,000...... This Due Bill is only good when signed by one and countersigned by another authorized person and is payable only in the Exchanges through the Clearing House the day after issue. $280,000. W. B. Burton, Teller." It was countersigned John W. Frank A. Treasurer.

The figures 3-48 are the clearing house numerical designation of the defendant. Burton, as teller, and Frank, as assistant treasurer, were authorized to sign clearing house due bills issued in the regular course of business; their names and authority so to sign were filed with the clearing house association and with each member, including defendant as required by the rules; in other words, they were held out by Union Bank as the proper persons to issue due bills as its obligations.

The rules provide for the issue, use, and effect of such bills. See Philler et al. v. Patterson, 168 Pa. 468; Yardley v. Philler, 167 U. S. 344. A pertinent rule is as follows: "These due bills shall be used only on the day of issue and shall be payable through the exchanges, through clearing house, the day after issue. Members issuing due bills shall have inserted names or clearing house numbers of the institutions through which they are to be cleared. A member shall give these due bills to other member institutions upon demand, in payment of items at their counter, when the amount exceeds $500." Plaintiff, in its reply, admitted that "bank due bills are so largely and generally used in the payment or settlement of debts and in other commercial transactions, that they have acquired the characteristics of cash, and, when drawn, signed and issued by the officers duly authorized to issue the same, they become absolute undertakings of the bank issuing them and an appropriation of its credit in the clearing house to which the due bill is presented and through which it is settled."

In issuing this due bill, Frank and Burton were fiduciaries within the meaning of the Uniform Fiduciaries Act of May 31, 1923, P. L. 468: Norristown-Penn Trust Co. v. Middleton, 300 Pa. 522. Section 5 controls this case. Under section 5 (quoted in the margin)* we have

---

* "Section 5. Check Drawn by Fiduciary Payable to Third Person.—If a check or other bill of exchange is drawn by a fiduciary as such, or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, the payee is

a due bill drawn by registered fiduciaries "in the name of the principal" (Union Bank) to defendant, payee. The fiduciaries, Burton and Frank, who drew it, are not personally interested; it is not "payable to a personal creditor of the fiduciary [or] delivered in payment of, or as security for, a personal debt of the fiduciary" who drew it. According to section 5, then, the defendant payee was not bound to inquire whether the fiduciaries who drew it were "committing a breach of his [their] obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary," in the absence of actual knowledge or bad faith. Such bad faith on the part of defendant, within section 5 is neither averred nor proved. Defendant was entitled to accept the bill with no further inquiry than to see that the registered fiduciaries, Burton and Frank, had in fact executed it as the obligation of the clearing house member who held them out as specifically authorized to perform that act. As there is nothing on the face of the instrument to indicate dishonest taking by McCulloch of the bank's funds to pay his own debt, the instrument was good, prima facie, in defendant's hands, as matter of law.

We must then see whether there is any evidence, in the words of the statute, of "actual knowledge of such

not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. If, however, such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of, or as security for, a personal debt of the fiduciary to the actual knowledge of the creditor, or is drawn and delivered in any transaction known by the payee to be for the personal benefit of the fiduciary, the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the instrument."

breach," i. e., misappropriation, or "knowledge of such facts that his [defendant's] action in taking the instrument amounts to bad faith." As there is no allegation that defendant had "actual knowledge" of misappropriation, we consider only whether there is evidence of knowledge of such facts that defendant's action in taking it amounted to bad faith. These words from section 5, are the same as those used in section 56 of the Negotiable Instruments Law, and should have the same construction in the interest of desirable uniformity in the construction of commercial paper. As the instrument was good on its face, there was no apparent reason for inquiry; it remained good until shown to have been taken in "bad faith," and the burden of proving that was on plaintiff. On this subject, the learned trial judge said: "In the case at bar we find that the payee had knowledge of such facts that his [its] action in taking the instrument amounted to bad faith, and so was bound to inquire whether · the fiduciary was committing a breach of his obligation as fiduciary in drawing or delivering the instrument. ...... The test in a case like the present one, where bank funds are used to pay the personal indebtedness of a bank officer, is that of 'duty of inquiry' and not that of bad faith." If the evidence supported the finding that defendant "payee had knowledge of such facts that [its] action in taking the instrument amounted to bad faith," it would have been dishonest to take the due bill because of this subjective bad faith, and, that fact established, inquiry would have elicited nothing more, and would have no further place in the problem, and plaintiff's right to get back its money would be established; this would follow, not because no inquiry was made, but because of defendant's knowledge of the officer's breach of trust without inquiry. Inquiry is unnecessary if a payee already knows the facts; it may be necessary when the facts are not known. When it is decided that inquiry should have been made, and was not, a taker will be held to have

acted in bad faith, if inquiry should have elicited the officer's misappropriation; a payee is not excused for not discovering what he could so have learned. As, earlier in his adjudication, the judge had made a definite finding of fact that "defendant failed to make any inquiry whatever into the authority of McCulloch," and apparently put his decision on that ground, it may be that what was said about 'bad faith,' in the extract quoted above, was intended to be an inference from the finding of fact that no inquiry was made. But, that merely brings the question back to the starting point without demonstrating anything, because there was nothing on the face of the due bill to make inquiry necessary; under the statute, it was unnecessary.

Laying the due bill aside, then, is there evidence of bad faith in the record? We can find none. When the evidence is examined, it is manifest that defendant acted in good faith from beginning to end; there was no motive for or profit in wrongdoing. Section 1 of the act provides that "A thing is done 'in good faith' within the meaning of this act, when it is in fact done honestly, whether done negligently or not." The executors delivered the stock at the same price for which they had a bid in competition with McCulloch's; defendant gave value for the due bill. It is reasonable to assume that if the executors had doubted McCulloch's integrity, they would have sold to Smith & Co. and not to a buyer whose standing was questionable. Appellee says that there was newspaper publicity on March 21st, the day before the delivery of the stock, that the Union Bank had had "business dealing with alleged bootleggers and a rumring," which should have put defendant on notice that there was something wrong; that "publicity" amounts to nothing as evidence of notice in a transaction like that before us: Chemical Nat. Bank v. Tuttle, 2 Sad. 328, see page 333; 46 C. J., page 549. It is also suggested that some inference should be made against appellant because it first asked for a certified check or bank check

or due bill, and in the letter transmitting the stock for delivery, asked for a due bill to the order of the Mitchell estate or to itself. In view of the admitted general use of such clearing house due bills as cash, that request will not support an inference of bad faith; on the contrary, if the subject was thought of at all, appellant knew that the clearing house rules required the certificate of two persons (neither being McCulloch) to the lawful issue of a due bill. McCulloch did not transfer the bank's funds to the defendant. The mere fact that a bank officer was buying something and using the facilities of his bank to make payment, will certainly not support an inference of bad faith or wrongdoing; the statute recognizes that an officer of a bank may be a customer of the bank (Act of June 14, 1901, P. L. 561, amended April 26, 1929, P. L. 812), and the Uniform Fiduciaries Act is drawn with that fact in contemplation; part of the business of a bank is paying money on behalf of its customers to persons to whom it is not indebted. But appellee says, delivery of the stock was made on the fifth day after Brown received authority from the executors to act, instead of taking almost ten days as he told McCulloch might be required; surely bad faith in taking the due bill cannot be predicated of diligence in performing the executor's duty to convert an asset of their estate. Defendant had no interest in the stock or in its sale, except as coexecutor; the proceeds of the due bill would not belong to defendant; it knew nothing about McCulloch's arrangement with Vice-President Fairlamb; it was entitled, for aught that appears, to assume that the registered fiduciaries, Frank and Brown, would not violate their trusts.

Bad faith is not a matter of conjecture; it must be proved, and, like many other facts, may be proved by circumstantial evidence; but it is well settled that it is not sufficient to show suspicious circumstances (without now suggesting that there was ground for suspicion here) such as might lead a person, before taking a pa-

per, to make inquiry, but material mala fides must be proved: Phelan v. Moss, 67 Pa. 59, 63; Lancaster Co. Bank v. Garber, 178 Pa. 91, 97; Johnson Co. Bank v. Koch, 38 Pa. Superior Ct. 553, 560; Norristown-Penn Trust Co. v. Middleton, supra.

On this point of "bad faith," appellee's admission in argument that McCulloch's certified check would have made a good payment is also significant; why should any fact in this regard suggest bad faith in the taking of the due bill without having precisely the same effect if a check had been certified? Yet, in each case, the direct obligation of the bank to pay to the holder would be created, and, in each case, the actual fact might have been different from what the paper showed.

Appellee, conceding that the due bill was executed by duly authorized fiduciaries to pass as cash (cf. Crane et al. v. Bank, 173 Pa. 566, 578; Yardley v. Philler, supra) and was not given to pay the debts of either of them, recognized that it must remove the effect of their action in order to sustain a right to recover. It attempts to do so as follows: "It is true that the instrument is not signed by the bank officer [McCulloch] but is signed by subordinate officers acting under specific instructions from their superior officer [Vice-President and Treasurer Fairlamb]. We contend this fact is immaterial and that the present case falls within the spirit, if not the language, of section 5, because the act of the subordinate officers was in fact the act of their superior." We cannot accept the argument. It would entirely nullify the rules of the clearing house association pursuant to which such due bills have been used with the effect stated for upwards of 50 years, and, what is a more serious obstacle, would set aside the Uniform Fiduciaries Act.

There is no evidence in the record that McCulloch and Frank, or Burton, or Fairlamb, or any of them, conspired among themselves or with the defendant to embezzle the money of the Union Bank. A different case would be presented if the due bill had been drawn by

McCulloch; there would then be some foundation for appellee's argument that a case within the statute was presented. It is at this point that appellee's contention breaks down; to accept the argument, it is necessary to treat the due bill as drawn by McCulloch; but he did not draw it and his name does not appear on it; so far as the clearing house rules appear, McCulloch had nothing to do with the execution or issue of such due bills. He gave no instructions to Frank or Burton; their instructions came from the vice-president and treasurer. Throughout its argument, appellee speaks of McCulloch as the fiduciary, but he was not a fiduciary within section 5 because he neither signed nor issued the paper, and section 5 fixed the obligations of the parties in the light of the facts as they were on the day of delivery.

Appellee also contends that if the case is not under the act, recovery should be allowed under another rule of law. It quotes the general rule stated in Fehr v. Campbell, 288 Pa. 549, that one who takes "negotiable paper which appears to be, or which the taker knows to be, the property of a corporation, for the purpose of applying such paper to the personal use of one of the officers of such corporation, or of a third party, is bound to inquire as to the authority of the officer to make such use of the paper, and if no inquiry be made, the taker is held as though he had knowledge of all that inquiry would have revealed." That rule was applicable in Fehr v. Campbell, because the note in question, the property of a corporation, was transferred for less than its face by the president of the corporation, with the understanding that the transferee, when he collected it from the maker, should use part of the proceeds to pay a debt due himself by the president of the corporation who conducted the negotiation. But the express terms of that rule exclude its application to the present case, because this instrument was drawn by designated fiduciaries, who were in no wise interested in the obligation which it paid; McCulloch, the president was not a party to it.

That rule might apply if McCulloch had given a check or draft signed by him, as president, on funds of Union Bank in its depository; such an instrument would then have carried on its face notice of his breach of trust. But the due bill took McCulloch out of the transaction, as a bank officer.

The rule quoted above was also applied in Norristown-Penn Trust Co. v. Middleton et al., 300 Pa. 522, in which an assistant treasurer of a bank drew drafts on the bank's funds, and paid his debts with the drafts; here again the drafts carried notice of possible breach of trust. It was also applied in Schmitt v. Potter Title & Trust Co., 61 Pa. Superior Ct. 310, in which the officer of a corporation (one, Coleman) in his official capacity drew checks on the corporation's bank account and with them paid his debts; here, too, there was warning of possible breach of authority on the face of the paper. But it cannot be said, as appellee suggests, that it appears that McCulloch was using the bank's funds to pay his debts, in the sense in which personal debts of an officer were shown by the face of the instrument to be paid in any of the three cases mentioned. Another of Coleman's reported transactions may, however, be referred to at this point to illustrate the rule that is applicable to the present case: Schmitt v. Mellon Nat. Bank, 67 Pa. Superior Ct. 453. Coleman, as treasurer of a corporation, drew a corporate check specifically showing on its face that it was given to pay his personal debt. Notwithstanding that warning, the check was certified by the drawee bank; it came into the hands of defendant who collected it for a forwarding bank. On the failure of Coleman's corporation, the receiver sued to recover on the ground "that the check bore upon its face the evidence that Coleman was using the funds of his company to pay his personal debt and that the Mellon Bank was therefore put upon inquiry," etc. But it was properly held that the "certification is equivalent to an acceptance" (section 187 Neg. Inst. Law, 1901, P. L.

194); that "When the trust company [drawee] certified the check it became responsible for its payment. ...... When this check came into the hands of the Mellon Bank duly certified it was not concerned as to the relations between Coleman and the corporation of which he was treasurer." The statute relieved defendant bank from inquiring whether Coleman and his company had agreed that he should pay his debt by using the funds of the corporation, or whether he was misappropriating its funds. Whiting v. Hudson Trust Co., 234 N. Y. 394, at page 404, referred to later, is to the same effect.

Anyone dealing with an agent or other fiduciary is presumed to know that such fiduciary must act within the limits of his authority and may not make a profit at the expense of his principal without consent; that if it appears that the fiduciary is dealing with such property as his own, that fact creates the necessity of inquiring whether such conduct, ordinarily outside the scope of the authority, has been especially authorized. The great volume of the commercial transactions of the country requires the use of checks, drafts and similar instruments; a large part of them must be drawn or negotiated by fiduciaries or agents; they must pass through banks all over the country. Uniform and definite rules were found necessary to take the place of diverse and conflicting rules that had grown up concerning constructive notice of breach of fiduciary obligations in order that commerce might proceed with as little hindrance as possible and, at the same time, that loss for breach of such obligation should fall on the party directly responsible for the faithless agent and not on one who was a mere conduit to transmit the fund; this necessity led to the enactment of the Uniform Fiduciaries Act, already adopted in fourteen states. If now we adopted the contention of appellee, and held that, though two fiduciaries, specially registered for the purpose of issuing the instrument in suit, had executed it, the statute

did not mean what it said, because the due bill was used by the president of the bank to pay for his purchase, we should nullify the statute and create the very condition of uncertainty which it was passed to correct. See 2 Paton's Digest, page 1421, etc., also see, generally, Scott, Participation in a Breach of Trust, 34 Har. Law Rev. 454, 461; Rightmire, The Doctrine of Bad Faith in the Law of Negotiable Instruments, 18 Mich. Law Rev. 355, 367. It is, of course, true that fraud may be perpetrated by a faithless officer, but that possibility of itself does not, and commercial experience has shown that it is essential it should not, make every third party who handles the instrument liable except as the statute specifies.

Moreover, the weakness of appellees' contention appears by a concession in its brief that if McCulloch had delivered a certified check for the stock, plaintiff could not recover. It is settled that such certification obligates the bank to pay to the holder, even though the certification was a mistake and the depositor without funds: Schmitt v. Mellon Nat. Bank, 67 Pa. Superior Ct. 453, and cases cited in that opinion. In Bulliett v. Allegheny Trust Co., 284 Pa. 561, we quoted as follows: "The certification constitutes a new contract by the holder and bank. ...... By certifying, the drawee bank enters into an absolute agreement to pay the check upon presentment at any time within the time fixed by the statute of limitations;" see, also, pages 567 et seq. In Whiting v. Hudson Trust Co., supra, in considering a check drawn by a fiduciary in breach of his trust, CARDOZA, J., said: "The payee of the check, before delivering it to the defendant, had caused it to be certified. The legal result was the same as if he had received the cash over the counter [citing cases]. Between the drawee bank and its depositor, the check had been paid. ...... The payee was the owner of a chose in action, the drawee's promise to pay, just as much as if he were the holder of a cashier's draft: Goshen Nat. Bank v. State of N. Y., 141 N. Y. 379. ...... What the defendant [taking the check as a de-

posit] turned into money was not the obligation of the maker, but that of the drawee......" If, therefore, McCulloch had delivered his check, certified by the proper officer of the bank, the bank could not recover, as appellee concedes. Yet there is no difference in substance between the two modes of payment, unless it be that the holder of the due bill would seem to be in safer position in consequence of the Uniform Fiduciaries Act, than the holder of a certified check, because the due bill required two authenticating signatures while certification would require but one. By certifying a check, a drawee bank asserts that the drawer has an account in the bank to the amount of the check, and, in that belief, the defendant would have the right to accept the check. But defendant had precisely the same right to accept the due bill on the same ground, and, as the evidence shows that every member of the clearing house knew that the due bill passed as cash, defendant was justified in accepting it in the belief that everything was done that was required. It is true that in either case the fact might be otherwise, i. e., that McCulloch had not put the bank in funds; but in neither case, could the defendant know it; it could rely on the bank's declaration that he had, just as, in the second of Coleman's Cases, supra, the Mellon Bank was entitled to rely on the certification by the drawee bank, even though the check bore on its face a statement that it was being used to pay the agent's personal debt.

As matter of law, plaintiff has failed to present a prima facie case. It is therefore unnecessary to consider the other defenses interposed.

The judgment is reversed and is here entered for the defendant.