SKINNER, Appellant, v. THE FIRST NATIONAL BANK & TRUST CO. OF WATERTOWN, Respondent.

(249 N. W. 821.)

(File No. 7436. Opinion filed August 12, 1933.)

*C. R. Jorgenson,* of Watertown, for Appellant.
*Case & Case,* of Watertown, for Respondent.

WARREN, J. The appellant for twenty-seven years owned and operated a general trucking business in Watertown, S. D., was adjudged insane, committed to the state hospital at Yankton, S. D., in April, 1930, spent some three or four months there, and was discharged on the 28th day of August, 1930. Upon plaintiff's return to Watertown, he found that his business had been sold to Jankord and Nichols. The defendants Jankord and Nichols having refused to return the business to plaintiff on his demand, plaintiff brought suit. Judgment on a directed verdict by the court was entered in favor of the defendant First National Bank & Trust Company. Plaintiff has appealed from the judgment and order denying new trial.

Appellant contends that he was the sole owner of personal property consisting of trucks, moving pads, office equipment, and various other articles used in connection with his draying business, all of the value of $2,100; that on or about the 1st day of August, 1930, defendants unlawfully took and carried away said property and converted the same to their use, to the damage of the plaintiff in the sum of $2,100; that during plaintiff's absence at the state hospital his son, Steven, entered into an agreement with the defendants to convey plaintiff's property to said defendants, and that said son had no authority to enter into such an agreement; that upon his return he made demand on the defendants through a letter to Carl Odegaard for the return of his property, but that they put him off with excuses and promises that they would settle with him

for his property, and that he therefore did not take immediate action to compel such settlement; that on January 31, 1931, plaintiff was called to the defendant bank by Carl Odegaard, an officer of said defendant bank, and asked to sign a transfer of title to the trucks so that licenses could be secured for said trucks; that said Carl Odegaard told plaintiff that by his signing said transfers plaintiff would in no wise waive his rights to demand a settlement for his property; that, if plaintiff failed to sign transfers, the business would be greatly damaged by the necessity of having to lay up the trucks until licenses could be secured; that Carl Odegaard assured plaintiff everything would be all right, and that, if he would sign said transfers, he (Odegaard) would see that plaintiff got paid for his business; that plaintiff would not have signed said transfers had he thought it would interfere with his getting back his trucking business; that plaintiff relied on Odegaard's statements; and that said Odegaard made such statements for the purpose of inducing this plaintiff to act thereon.

That the respondent First National Bank & Trust Company held a mortgage on appellant's property is admitted by both parties to this action, and the testimony shows that at the time appellant went to Yankton that there was still due and owing to the defendant bank the sum of $500. There is some evidence which tends to show that the respondent bank and trust company attempted to sell appellant's property after he left for Yankton, although respondent had not foreclosed on the property. The respondent bank contends that through its agent, Carl Odegaard, it merely tried to ascertain what said property would bring if foreclosed upon, and that it did not try to sell the property. Testimony in appellant's brief is to the effect that Carl Odegaard called on various men in Watertown to learn if they would be interested in purchasing the business of the Watertown Transfer & Storage Company, and also that it was through Odegaard that Jankord and Nichols made the purchase of said business. The respondent insists that Carl Odegaard merely acted as scrivener for the other two respondents at the time of the transaction, and that he merely drew up the papers which conveyed the property from appellant to Jankord and Nichols; and contends that said bank and trust company should not be made a party to this case or be held liable simply because its officer, Carl Odegaard, acted as scrivener during the transaction. How-

ever, the undisputed testimony is that, after the contract had been entered into, the proceeds of said transaction were given to Odegaard and were to be applied on the appellant's indebtedness to respondent bank and trust company. Appellant received none of the proceeds of said transaction nor was he paid the remainder of the purchase price.

■ The court having directed a verdict in favor of the defendant bank, and having submitted the question of conversion and amount of damages as to the other two defendants, the weighing of certain testimony becomes quite material. The record contains certain testimony which seems to us to support appellant's contention that there was a sharp conflict in the testimony, and that it was for the jury to say whether or not the respondent bank participated in the conversion. Scattered excerpts disclose conflicting testimony as follows:

Steven Skinner: "Carl Odegaard came down there and threatened to foreclose. I did not know what else to do, and he talked with Nichols and Jankord about them buying out the business, taking the business, and then Nichols and Jankord would pay the bank. I did not know what else to do so I finally came to that, and they agreed to take it over and arranged for a meeting one night to do the business, and we all met there and Carl Odegaard brought the papers along, and they were signed and the business turned over to Nichols and Jankord. He (Odegaard) made the suggestion that Nichols and Jankord might take over the business and he also suggested that the Dakota Warehouse might take over the business; might take the trucks and the mortgage and keep on with the business as we had been doing. Prior to the time the deal was made I met down in the First National Bank. I was called up there one day. I believe it was Odegaard who called. When I got there I saw two fellows from the Dakota Warehouse Company, Mr. Marks and Mr. Hannum. Carl was talking with them about taking over the—having them take over the trucks. I mean Carl Odegaard, when I refer to Carl. Short time thereafter deal was closed with Nichols and Jankord. Nichols and Jankord and Carl Odegaard and myself were present. Carl Odegaard brought some papers, some to sign up transferring the Watertown Transfer & Storage Company to Nichols and Jankord. I had had no talk with him about fixing out papers. I did not have anything

to do with fixing the papers, but he came down there that night they were all ready. I did not have anything to do with it. Carl Odegaard told where and how to sign. I did not get any money. I was not given any papers. I talked with Carl several times about it, but not with Nichols and Jankord until after Carl talked with them about it. I did not say much of anything. Odegaard fixed up the papers to sign up. I did not know much about it. I did not call him down. He (Odegaard) said we would meet down there. I did not tell him I had sold to Jankord and Nichols. Just met there that night and he had the papers. Yes, Odegaard was not called, he came of his own accord. He made the deal with them himself. (With Nichols and Jankord.)

"Referring to Ex. 7, Carl Odegaard wrote above my signature there 'Watertown Transfer & Storage Company, also known as Jim Skinner & Sons.' All I wrote was my name. When the papers were fixed up I turned them over to Odegaard right there. Had them just a few minutes. Just read them over. Odegaard took them away. I heard Mr. Odegaard testify that I took this contract and notes, and asked him to take them and make collections and apply it on Jim Skinner's notes. I did not do that. Just merely read them over and handed them right back. Odegaard, I presume, carried them away. I did not."

Will Skinner: "I had a talk with Odegaard in the bank once. It was in July. He asked me if I would be interested in taking over this line and I told him I did not want anything to do with it. I had another conversation about two weeks after the first one. He came over to my office. He asked me if I would not reconsider and take it over, and I told him I did not want it at all; I had plenty of trucks and he wanted to know if I would be interested in taking half of it. I told him I did not really care to do that because I did not think a legal title could be given for it. And he said 'We can give you title to it.' He said he had seen the Dakota Warehouse. He came back and told me the Dakota Warehouse would not take any of it. That was about a week before the transfer was made to Nichols and Jankord. He told me he could sell me the trucks for $650.00, three trucks if I remember right."

J. A. Nichols: "But the proceeds supposed to be paid by me for the purchase of this property was to be paid over to the bank, and it was to be applied, as I understood it, on Jim Skinner's mort-

gage and note. I had that understanding with Steven Skinner and Carl Odegaard."

■ The first question presented by the record on this appeal is one of authority to sell. Did Steven Skinner have the authority to sell the property and business without the consent of the appellant? The testimony shows that Steven Skinner was not a partner in the firm, that he had no money therein invested, did not participate in the profits or losses of the firm, never had signed any notes, mortgages, checks, or instruments of any kind for the company, and was merely employed by the appellant, his father, to assist with the work, and that he was paid by check for his work the same as the other hired hands.

As to the question of conversion, the jury found that Jankord and Nichols, two of the defendants, were liable in conversion, and by direction of the court found the defendant bank and trust company was not liable.

The testimony shows that the respondent bank and trust company, through its officer Carl Odegaard, received the proceeds of the sale of appellant's property, and that Carl Odegaard assisted Steven Skinner and Jankord and Nichols in making the transaction. Section 4, 38 Cyc. 2054, says in regard to the liability of any person who aids in an act of conversion: "Every person is liable in trover who personally or by agent commits an act of conversion or who participates by instigating, aiding or assisting another, or who benefits by its proceeds in whole or in part." See, also, Burleson v. Langdon, 174 Minn. 264, 219 N. W. 155, and Talich v. Marvel, 115 Neb. 255, 212 N. W. 540.

Did the respondent bank, by assisting in the unlawful sale of appellant's property and by receiving the proceeds of said sale, become equally liable with the other two defendants? In many cases in conversion the courts have held that any person who intermeddles with the property of another is responsible to the owner of said property.

■ And, if any person aid in the conversion of property, he is responsible to the owner for all damages sustained by him. In Stevenson v. Valentine, 27 Neb. 338, 43 N. W. 107, 108, the court said: "Under the usually adopted principle of law, that he who intermeddles with personal property which is not his own must see to it that he is protected by the authority to act, or that

he will be himself liable, and that if he do an unlawful act, even by the command of another acting as principal, and without right, a liability will attach." See, also, Russell v. State, 13 Neb. 68, 12 N. W. 829.

Respondents claim that their act of purchasing the business of appellant from Steven Skinner was an act for the good of the appellant and to save what was left of the business. However, good intent is of no account in a civil action brought by one man to recover damages for a wrongful interference with the property of another. See Velsian v. Lewis, 15 Or. 539, 16 P. 631, 3 Am. St. Rep. 184; Louisville & N. R. Co. v. Lawson, 88 Ky. 496, 11 S. W. 511.

We agree with the contention of the appellant that the disputed questions of fact and contradictory evidence presented by the record should have been submitted to the jury as to the bank as well as to the other two defendants. In McKeever v. Homestake Mining Co., 10 S. D. 599, 74 N. W. 1053, 1054, the court said: "If the facts are in dispute, or if, undisputed, they are such that different impartial minds might fairly draw different conclusions from them, they should be submitted to the jury."

And also in Kielbach v. Chicago, M. & St. P. Ry., 13 S. D. 629, 84 N. W. 192, 194, it was held that: "It is the province of the jury to weigh and pass upon the evidence, to reconcile conflicting testimony, to determine the truth or value of evidence, to ascertain and declare from the evidence and testimony the facts of the case, and from the facts as ascertained by them, and the law as given to them by the court, to arrive at and announce their decision."

An examination of appellant's assignments of error indicates that the main assignment deals principally with the court's directing a verdict, and, having reviewed and decided that assignment of error in favor of the appellant, we need not consider any other matters assigned as error at this time.

The order and judgment appealed from are reversed.

RUDOLPH, P. J., and POLLEY, J., concur.

ROBERTS, J., concurs in result.

CAMPBELL, J. (dissenting). I do not think there is sufficient evidence to show any conversion by the bank in this case. I therefore believe there should be an affirmance.