Davis, Trustee, Appellant, *v.* Pennsylvania Company, Etc.

Argued January 30, 1940. Before MAXEY, DREW, LINN, STERN, BARNES and PATTERSON, JJ.

*B. D. Oliensis*, with him *Michael M. Linden,* for appellant.

*John Kennedy Ewing, 3rd,* with him *Maurice Bower Saul,* of *Saul, Ewing, Remick & Saul,* for appellee.

OPINION BY MR. JUSTICE STERN, March 25, 1940:

This is an attempt by the beneficiaries of a trust to impose upon a bank, which was the depository of the trust funds, liability for embezzlements committed by the trustee. The court below—in our view properly— was of the opinion that the circumstances did not make defendant responsible, and accordingly entered judgment n. o. v. in its favor.

Caroline B. Davis, who died in 1903, by her will bequeathed her residuary estate, consisting of stocks and

bonds, to her sons Thomas C. Davis and Nathan H. Davis, in trust to pay from the income the sum of $1,000 per annum (reduced by a codicil to $800) to one of her daughters, Caroline Davis, for life, and the balance to her other children; upon the death of Caroline the principal to be divided among the then surviving children and issue of deceased children of testatrix. One of the clauses of the will was as follows: "I entrust the investment of the principal of my estate to the discretion and judgment of my said trustees but as . . . the stock of the Knickerbocker Ice Company and of the Davis Spring Plate Company are good dividend payers I recommend that my trustees should hold them so long as in their judgment it is prudent and proper to do so." By a codicil testatrix authorized the trustees, if the income proved insufficient, to pay out of principal whatever might be needed from time to time to pay the $800 annuity, and for that purpose to sell and convert the necessary amount of assets.

Thomas C. Davis died in 1920, and thereafter, until his own death in 1934, Nathan H. Davis continued as sole trustee. When he died, Leicester K. Davis, a grandson of testatrix, was appointed as substituted trustee and brought the present suit to recover moneys which, after the death of Nathan H. Davis, were discovered to have been embezzled by him.

Nathan H. Davis had carried a personal account with defendant bank since the year 1901, and also, during the period of his sole trusteeship, an account in the name of the trust estate. The methods by which he accomplished his defalcations were these: He would give securities of the trust to defendant to sell for the trust account, and after defendant made the sale and credited the proceeds to that account he would promptly draw a check to his order personally, sign it as trustee, deposit it to his own account in defendant bank, and subsequently withdraw and appropriate the money. He would also make loans from defendant pledging securities of

the trust estate as collateral; after defendant sold the securities to liquidate the loans and credited the proceeds to the trust account he would transfer the money to his personal account in the same manner. These transactions occurred at irregular intervals during the years 1930, 1931, and 1932, and the total amount thus embezzled, consuming the entire estate, was $18,400, the recovery of which is now sought.

The liability of defendant for accepting the deposits in the trustee's personal account of the checks signed by him as fiduciary, and for paying checks drawn on that account whereby the trust moneys were ultimately embezzled, is governed by section 9 of the Uniform Fiduciaries Act of May 31, 1923, P. L. 468, which provides that "If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary . . ., the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary, and the bank is authorized to pay the amount of the deposit, or any part thereof, upon the personal check of the fiduciary, without being liable to the principal, unless the bank received the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith." The words "bad faith" are not defined in the act, but section 1 (a) states that "A thing is done 'in good faith,' within the meaning of this act, when it is in fact done honestly, whether it be done negligently or not." Since "bad" is the antonym of "good," it follows that a thing is done in *bad* faith, within the meaning of the act, only when it is done *dishonestly* and not merely negligently.

There is no evidence, nor indeed any contention, that defendant had actual knowledge that the trustee was

committing a breach of his obligation as fiduciary. The only question, therefore, is whether there were such facts known to defendant that its action in the matter amounted to bad faith. As has been previously pointed out by this court,[1] section 9 of the Uniform Fiduciaries Act lays down the same test of responsibility in this respect that section 56 of the Negotiable Instruments Law of 1901, P. L. 194, does in regard to notice of an infirmity in a negotiable instrument or defect in the title of the person negotiating it. This section of the Negotiable Instruments Law was merely declaratory of the common-law ruling that it was not sufficient to establish notice of such infirmity or defect in title by proof of circumstances which ought to excite the suspicion of a prudent man, but that it was necessary to prove actual bad faith.[2]

At what point does negligence cease and bad faith begin? The distinction between them is that bad faith, or dishonesty, is, unlike negligence, *wilful*. The mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith (*Union Bank & Trust Co. v. Girard Trust Co.,* 307 Pa. 488, 500, 501), unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction, —that is to say, where there is an intentional closing of the eyes or stopping of the ears.

There is nothing in the present case to convict defendant of bad faith in honoring the checks drawn by the trustee as fiduciary and deposited by him in his personal account and those making withdrawals from the latter account. Plaintiff points to the number (eight-

---

[1] *Union Bank & Trust Co. v. Girard Trust Co.,* 307 Pa. 488, 498; *Gordon v. Diffenderffer,* 317 Pa. 425, 429.

[2] *Phelan v. Moss,* 67 Pa. 59; *Moorehead v. Gilmore,* 77 Pa. 118, 124; *Second National Bank of Clarion v. Morgan,* 165 Pa. 199, 204, 205; *Lancaster County National Bank v. Garber,* 178 Pa. 91, 97, 98.

een over a course of two years) and the amount of these transfers, but loses sight of the fact that defendant presumably knew nothing about the assets of the trust, or what other bank accounts the trustee might be maintaining or what proportion of the entire estate was represented by the $18,400 transferred from the trust account to the personal account. As far as defendant was informed the $18,400 might have constituted only a small part of the trust funds, and might have been owing to the trustee because of commissions due him over a long period of years or of advancements made by him for the purchase of investments. The very purpose of the Uniform Fiduciaries Act was to facilitate banking transactions by relieving a depository, acting honestly, of the duty of inquiry as to the right of its depositors, even though fiduciaries, to check out their accounts.

Plaintiff maintains that the first of the transfers by the trustee should have invited defendant's suspicion in that it resulted in the trust account being overdrawn by about $4,000. It appears that three days before that transfer defendant had sold for the trustee bonds of which the proceeds amounted to approximately $4,500, but this sum was not credited to the trust account until a week after the transfer had been made. There was nothing extraordinary or questionable about this, because at the time the bank allowed the transfer it had in its possession either the proceeds of the sale of the bonds or the obligation of the purchaser to pay for them, so that the overdraft was amply secured and the bank was merely extending to a depositor the not unusual courtesy of allowing a withdrawal from the account before the actual crediting of the purchase money for the securities sold.

A careful study of the record reveals no facts or circumstances which should have made defendant suspicious that the trustee was embezzling the funds of the estate or that there was any serious irregularity in his transactions. Much less was there any evidence to

charge it with the dishonesty or bad faith which the Uniform Fiduciaries Act prescribes as the sine qua non of liability. This is especially true in view of the fact that Nathan H. Davis had been a trustee of the estate for twenty-seven years, during which time nothing untoward had ever occurred.

A special question is raised by plaintiff in regard to the sum of $11,121.25 which was the part of the moneys deposited in the trust account arising from loans made to the trustee by defendant. There were six such loans, one of them consisting of the overdraft previously referred to, an overdraft being legally regarded as in the nature of a loan: *Pennsylvania Company for Insurances on Lives and Granting Annuities v. Ninth Bank and Trust Co.*, 306 Pa. 148, 152. All of them, other than the overdraft, were accompanied by securities of the trust estate as collateral, and defendant repaid itself by retaining all or part of the proceeds of the collateral which it sold, except in one instance where it credited all of the proceeds of the sale to the trust account and then the trustee paid defendant the amount due on the loan by a check drawn on the trust account. It is plaintiff's contention that the trustee had no authority to borrow money or pledge collateral on behalf of the trust estate, that when he did so he made himself personally liable, and, therefore, that defendant could not accept trust assets in payment of such obligation; as to the check of the trustee given in payment of the one loan, plaintiff claims that defendant is liable by virtue of section 7 of the Uniform Fiduciaries Act, which imposes such liability if a check signed by a fiduciary and made payable to the drawee bank is delivered to it in payment of a personal debt due it by the fiduciary and if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check.

The whole structure of plaintiff's argument on this phase of the case is without any supporting foundation inasmuch as the trustee did have the power to borrow

and pledge securities of the trust estate as collateral for the loans. The will and codicils of Caroline B. Davis not only gave authority to the trustees to sell and convert so much of the principal of the estate as might be necessary from time to time to pay the $800 annuity to her daughter, but, what is of greater importance, entrusted the investment of the principal to their discretion and judgment, with a recommendation that they should hold two stocks designated by her as long as they thought it prudent to do so. This provision can be construed only as a grant of authority to sell any or all of the assets of the trust estate whenever the trustees considered it advisable so to do: Restatement, Trusts, section 190 (b) ; *Streater's Estate,* 250 Pa. 328, 334. Having such general power to sell the securities, the trustee had likewise the power to pledge them: *Lancaster v. Dolan,* 1 Rawle 231, 248; *Gordon v. Preston,* 1 Watts 385, 386; *Duval's Appeal,* 38 Pa. 112, 118; *Pennsylvania Company for Insurances on Lives and Granting Annuities v. Austin,* 42 Pa. 257, 263; *Zane v. Kennedy,* 73 Pa. 182, 192; *Fidelity Insurance, Trust & Safe Deposit Co. v. Wurfflein,* 15 W. N. C. 28; *McCreary v. Bomberger,* 151 Pa. 323, 328; *Rieder v. Miller,* 68 Pa. Superior Ct. 529, 533, 534. While it is true these cases referred to the power of mortgaging, not pledging, there is no difference between these operations that would warrant a legal distinction in this connection. Plaintiff calls attention to the fact that England and the jurisdictions of the United States other than Pennsylvania have all rejected, or, having adopted, subsequently repudiated the doctrine that the power to sell involves the power to mortgage, and argues that the long line of authorities above cited as the decisions of this court, going back more than one hundred years, should therefore be overruled. This same argument was made nearly seventy years ago, and was answered by Mr. Justice SHARSWOOD in *Zane v. Kennedy,* supra (p. 192), as follows: "The whole case, then, is resolved into the question whether

in this state an absolute and unrestricted power to sell includes a power to mortgage. We cannot regard this as an open question. It was expressly decided in *Lancaster v. Dolan*, 1 Rawle 231, that a power to sell does include a power to mortgage, which is a conditional sale. It was not a mere *obiter dictum*, but the very point upon which the judgment hinged as to the remainder of the estate, over which there was a general power of appointment. It has since been recognized as the settled law in several cases: *Presbyterian Corporation v. Wallace*, 3 Rawle 109; *Gordon v. Preston*, 1 Watts 386; *Duval's Appeal*, 2 Wright 118; *Pennsylvania Life Insurance Company v. Austin*, 6 Id. 263. It is of no consequence whether the case of *Mills v. Banks*, 3 P. Williams 9, cited in support of the ruling in *Lancaster v. Dolan*, has or has not been subsequently disapproved of in England. We are bound to adhere to a determination of this court settling a rule of property, which has been so often recognized and affirmed. There would be no security for titles, nor could counsel advise with confidence if we were ready to listen to suggestions for the reconsideration of points solemnly determined by our predecessors whenever the courts of some other state or country have adopted a different rule."

There is little to be added to this trenchant exposition of the doctrine of stare decisis. An interpretation of law consistently followed by an appellate court over so long a period that it has become fundamentally imbedded in the common law of the Commonwealth should not be changed except through legislative enactment, which is a remedy always available and the proper one under our scheme of government. Otherwise the law would become the mere football of the successively changing personnel of the court, and "the knowne certaintie of the law," which Lord Coke so wisely said [3] "is the safetie of all," would be utterly destroyed.

The judgment is affirmed.

---

[3] Commentary upon Littleton, 395a.