CLARK J. GUILD, JR., EXECUTOR OF THE ESTATE OF ELMER WEST, DECEASED, APPELLANT, v. FIRST NATIONAL BANK OF NEVADA, RESPONDENT.

No. 8274

August 31, 1976                    553 P.2d 955

[Rehearing denied September 29, 1976]

*Cooke, Roberts and Reese,* Reno, for Appellant.

*Swanson, Swanson & Capurro,* Reno, for Respondent.

# OPINION

By the Court, Mowbray, J.:

Clark J. Guild, Jr. (Guild), as executor of the estate of Elmer West (West), deceased, brought this action against Mary B. Adrian (Adrian) and First National Bank of Nevada (Bank) to recover the sum of $54,000 taken from West's bank account a few days prior to his death, by Adrian, acting through a power of attorney. The district court rendered judgment in favor of Guild and against Adrian for the sum of $54,000, together with interest and costs, and the court rendered judgment for Bank and against Guild. Guild has appealed the latter portion of the judgment.

1. *The Facts.*

The facts in this case are not in dispute. Guild is the executor of the estate of West, deceased. West died in Reno on November 16, 1973. For some time prior to his death he was confined to the Washoe Medical Center, suffering from cancer, a terminal illness. Adrian had known West for many years, and she saw him daily at the hospital up to and including the day of his death.

Guild was the attorney for West, and he had been for many years prior to the death of West. On November 5, 1973, eleven days before West's death, West advised Guild that he, West, had a time certificate of deposit in the amount of $35,000 in a safety deposit box at the Bank. The time certificate had been issued by Security National Bank, and it was due and payable. West asked Guild to have the time certificate cashed and deposited in his commercial account at the Bank.

Guild prepared a general power of attorney and left it with West on November 5, 1973. On Guild's next visit to the hospital, on November 6 or November 7, West told Guild that he would not sign the power of attorney as it had been prepared, but that he would sign a limited power of attorney that would permit Guild to enter his safety deposit box, take possession of the certificate of deposit, and deposit the proceeds in his commercial account at the Bank. Guild then prepared a limited power of attorney, which West signed at Washoe Medical Center on November 8, 1973. Adrian was one of the witnesses to West's signature. On November 8, 1973, Guild, accompanied by Adrian, went to the Bank to obtain the certificate of deposit.

Adrian had the key to West's safety deposit box. They obtained the certificate of deposit and took it to Washoe Medical Center for West's endorsement. They learned that the certificate of deposit did not mature until November 12, 1973. On that date, Guild cashed the time certificate of deposit and received two checks, one in the amount of $35,000 and the other in the amount of $431.50, representing the interest on the time certificate of deposit. Guild then took the two checks to Washoe Medical Center and obtained West's endorsement, whereupon Guild took the two checks to the Second and Virginia office of the Bank and there talked to Herbert Brown, the manager, who assisted in filling out the deposit slip. Mr. Brown was told of West's condition and that he was in Washoe Medical Center terminally ill with cancer.

On November 9, 1973, Adrian, unbeknown to Guild, went to the Bank and obtained a bank form power of attorney signature card that would, when properly executed, authorize her to sign and endorse checks, notes, and drafts and transact all business with the Bank in connection with the commercial account of West as his attorney-in-fact. James Bronson, the assistant operations officer, who obtained the power of attorney card for her, had it filled in and gave her instructions on having it signed at the hospital by West. Adrian told Bronson about West's condition. Adrian took the power of attorney to Washoe Medical Center and obtained the signature of West thereto. On November 12, 1973, Adrian took the executed power of attorney to the Bank, wrote a check on the account of West, payable to cash, in the amount of $17,000, and cashed the same at the Bank. On the same day, Adrian opened a personal checking account at the South Virginia office of the Bank and deposited $14,000 in that account.

On November 13, 1973, Adrian went to the Bank and cashed a check on the account of West, payable to cash, in the amount of $37,000, and received therefor a cashier's check from the Bank, payable to her in that amount. Adrian cashed the $37,000 cashier's check at the Bank on November 20, 1973, four days after West's death. Adrian drew $13,000 from her account on November 13, 1973, and cleared the account on January 24, 1974. She testified that all the money had been spent.

On these facts, the district court found that West had executed the power of attorney for the purpose of having Adrian pay his outstanding bills and that the withdrawals were made without the consent or knowledge of West and that they were

converted to the use of Adrian by her. The court further found that the Bank had notice that the funds being withdrawn were being paid directly to Adrian and that a considerable portion of such funds were drawn in cash. However, the court found that cash withdrawals were common at this office of the Bank and that the Bank had no notice or knowledge of a misappropriation of the funds by Adrian. Appellant Guild contends that this finding was in error, and he asks this court to find liability on the part of the Bank as a matter of law, which we cannot do.

2. *The Bank's Liability.*

The issue of the Bank's liability is governed by the provisions of the Uniform Fiduciaries Act. In the instant case, NRS 162.090, covering the duty of a bank when a check is drawn upon the account of a principal by a fiduciary, is controlling with regard to Adrian's withdrawal of the $17,000 from West's account, and the issuance of the $37,000 cashier's check to Adrian.[1]

With respect to the $14,000 deposit Adrian made in her own checking account and the subsequent cashing of checks on that deposit, NRS 162.100 governs the Bank's liability.[2]

---

[1]NRS 162.090:

"If a check is drawn upon the account of his principal in a bank by a fiduciary who is empowered to draw checks upon his principal's account, the bank is authorized to pay such check without being liable to the principal, *unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith.* If, however, such a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check." (Emphasis added.)

[2]NRS 162.100:

"If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and indorsed by him, if he is empowered to indorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, *unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith.*" (Emphasis added.)

It is noted that Bank becomes liable in each instance if it receives the deposit or pays the check by the fiduciary with *actual knowledge* that the fiduciary is committing a breach of his obligation in making such deposit or in drawing such check *or* with knowledge of such facts that the Bank's action in receiving the deposit or paying the check amounts to *bad faith*.

Guild contends that the Bank had actual knowledge that Adrian was appropriating funds of her principal, West, and that the Bank's actions in respect to West's account amounted to bad faith on the Bank's part. Guild theorizes that actual notice is established by virtue of the Bank's knowledge that the $17,000 check cashed by Adrian and the $37,000 cashier's check issued to her constituted "trust" moneys and, because the Bank was aware that Adrian had opened a personal checking account at the same Bank and simultaneously deposited a large amount of money therein, that Bank *had* to know that the money was being used for Adrian's personal use.

This assertion is an allegation not supported by any direct evidence. Furthermore, under our statutory scheme, such an inference appears to be impermissible, since the Bank may, under NRS 162.090, *supra,* cash personal checks of the fiduciary on his principal's account and may, under NRS 162.100, permit such funds to be deposited in the fiduciary's personal account. It would defeat the purpose of the statutes to allow misconduct to be inferred from acts specifically permitted by the statutes.

We turn to consider whether the facts mandate the conclusion that the Bank was acting in bad faith in permitting Adrian to withdraw funds from West's account and in allowing her to deposit the same into her personal account. The Uniform Fiduciaries Act does not define bad faith. It does, however, define good faith as an act "done honestly, whether it be done negligently or not." NRS 162.020, subsection 2.[3] Courts, smitten with the notion of symmetry in the law, have concluded that bad faith, being the antonym of good faith, is an act done *dishonestly.* Colby v. Riggs Nat'l Bank, 92 F.2d 183 (D.C. Cir. 1937); Rheinberger v. First Nat'l Bank, 150 N.W.2d 37 (Minn. 1967); Davis v. Pennsylvania Co. for Ins. on Lives & Granting Annuities, 12 A.2d 66 (Pa. 1940). Logic of this

---

[3]NRS 162.020, subsection 2:

"2. A thing is done 'in good faith' within the meaning of NRS 162.010 to 162.140, inclusive, when it is in fact done honestly, whether it be done negligently or not."

sort, however, is less satisfactory than examining the underlying purposes of the Act in order to ascertain what definition of "bad faith" best accords with the legislative intent regarding a bank's liability when it deals with wrongdoing trustees and mismanaged trust accounts.

The underlying purpose of the Act was to facilitate the performance by fiduciaries of their obligations, rather than to favor any particular class of persons dealing with fiduciaries. 7 Uniform Laws Annotated 394 (West 1970). The Act was clearly meant to relax the standards of care owed by banks to principals and third parties when dealing with fiduciary accounts. Board of County Comm'rs v. First Nat'l Bank, 368 P.2d 132 (Wyo. 1962). Liability cannot be predicated on a showing of lack of due care, or negligence, because "bad faith" imports a moral connotation approximating purposeful or motivated conduct (misconduct). Cf. Davis, *supra*. There is no showing in the instant case that the Bank derived any benefit from Adrian's transactions,[4] actually knew or suspected that funds were being misappropriated, or deliberately or willfully closed its eyes or refused to investigate after having its suspicions aroused.[5] In the absence of one of such "scienters" or "conscious purposeful misconduct," banks may not be held liable.

Under the facts presented, we cannot rule as a matter of law in the instant case that the Bank is liable to Guild as West's executor. Therefore, the judgment is affirmed.

GUNDERSON, C. J., and BATJER, ZENOFF, and THOMPSON, JJ., concur.

---

[4] Had the Bank derived some benefit from these transactions (e.g., if Adrian had given trust moneys to the Bank in satisfaction of a debt she owed the Bank), the Bank would be liable if Adrian "in fact" breached her obligations. In other words, strict liability attaches in this situation. NRS 162.060; NRS 162.090.

[5] A mere failure to make inquiry, even though there are suspicious circumstances, does not constitute "bad faith" unless the failure is due to a deliberate desire to evade knowledge because of a belief or fear that the inquiry would disclose a vice or defect in the transaction. 5A Michie on Banks and Banking, § 57b at 172–173 (1973), citing *Davis, supra.*