Donald J. SMITH, Plaintiff and Appellant,

v.

Russell R. HALVERSON, Defendant,

and

First National Bank in Sioux Falls, a corporation, Defendant and Respondent.

No. 11913.

Supreme Court of South Dakota.

Argued Oct. 3, 1977.

Decided Dec. 29, 1978.

Gale E. Fisher of May, Johnson & Burke, Sioux Falls, for plaintiff and appellant.

Deming Smith of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant and respondent.

DUNN, Justice (on reassignment).

This is an appeal by Donald J. Smith (Smith) from a judgment dismissing his complaint against the First National Bank in Sioux Falls (bank) on a verdict directed against Smith by the trial court. We reverse and remand the case for trial.

Smith is a trucker who on August 20, 1974, entered into a contract with the Kolman Division of Athey Products Corporation of Sioux Falls to deliver some machin-

ery manufactured by Kolman for use in the construction of the Alaskan pipeline. On September 9, 1974, Smith received authority from the Interstate Commerce Commission to transport the equipment to Alaska. Because Smith owned no trucks himself, he entered into an agreement with Russell R. Halverson (Halverson), who was operating a number of trucks under the business name of M & R Trucking. Under the terms of the agreement, Halverson was to be paid $.45 per mile for the 6,700 mile round trip between Sioux Falls and Fairbanks, Alaska.

On September 30, 1974, Smith and Halverson went to the bank's downtown office and explained to Pat Marso, a bank officer, the general terms of the agreements between Smith and Kolman and between Smith and Halverson. Smith explained that in compliance with Interstate Commerce Commission regulations, payments for the shipments would be received in the name of Donald J. Smith so a checking account was established in the name of Donald J. Smith Transportation. Halverson then deposited $5,000 in the account. Smith and Halverson discussed the need for a third-party manager who would be authorized to sign checks on the Smith account. According to Marso's testimony, Halverson and Smith took the two yellow signature cards, on which Marso had printed "Donald J. Smith Transportation" and the social security number of either Halverson or Smith, with them when they left the bank. Smith testified that he and Halverson signed a white signature card before leaving the bank that day. Marso was not apprised of the exact nature of the financial arrangements between Halverson and Smith. He knew only that they were engaged in a joint venture with respect to hauling equipment to Alaska. At the time this account was opened, Marso knew that Halverson had a line of credit with and an account at the bank's industrial branch under the name of M & R Trucking and that he was considered to be in good standing with the bank.

Because the signature cards were not returned promptly, Marso asked Lee Viberg,

the manager of the industrial branch, to ask Halverson to return the cards to the bank, Marso being aware that Viberg had worked closely with Halverson's trucking account at the branch office. After Viberg contacted Halverson several times, the signature cards were finally returned with a letter dated October 30, 1974, which was signed by Halverson and Patricia Streett, and which asked the bank to recognize the signature of Streett for both the account of M & R Trucking and Donald J. Smith Transportation. The enclosed signature cards bore the signatures of both Halverson and Streett.

Because neither Halverson nor Streett testified either at trial or by way of deposition, the exact nature of Streett's role in the affairs of M & R Trucking and Donald J. Smith Transportation was never fully explained. Smith testified that he knew that Streett worked for Halverson. One of the exhibits introduced by Smith—a copy of the operating contract between Smith and Halverson described above—contained a vehicle inspection report, dated October 1, 1974, which was signed by Streett under the title "Inspector" and which bore Smith's signature certifying to the fact that the person who had made the inspection described in the report was duly authorized to make the inspection as Smith's representative.

The first two loads of equipment were loaded on Halverson's trucks on October 7, 1974, and were subsequently delivered to Alyeska Pipeline Service Company in Fairbanks, Alaska, on October 17, 1974. The bill of lading provided that the freight charges were to be collected from Morgan Equipment Co. of San Francisco, California (Morgan Equipment). On October 11, 1974, Streett prepared invoices in the amount of $5,798 for each of the first two shipments and sent them to Morgan Equipment for payment. Upon receiving signed copies of the bills of lading evidencing receipt of the shipment by the consignee, Smith sent statements to Morgan Equipment requesting payment. Morgan Equipment in return sent Smith a check in the amount of $11,-596, representing payment for the two shipments. Smith in turn endorsed the check and gave it to Halverson in payment of the $6,034 Halverson was entitled to under the hauling contract and as reimbursement for the $5,000 which Halverson had contributed to open the Donald J. Smith Transportation account. The check from Morgan Equipment was deposited in the Donald J. Smith Transportation account on November 1, 1974.

During the latter part of October 1974, Smith and Halverson made six more shipments of equipment to Fairbanks, Alaska. Invoices totaling $34,788 were mailed to Morgan Equipment on October 27 and 29, 1974. Sometime in November of 1974, Smith discovered that Streett was writing checks on the Donald J. Smith Transportation account. Smith testified that he confronted Halverson with this fact as soon as he became aware of it.

On November 8, 1974, Streett made a deposit in the amount of $12,500 to the M & R Trucking account in the form of a check drawn by her on her account in a Waynesburg, Pennsylvania, bank. Immediate credit was given to the M & R Trucking account. The check was returned to the industrial branch unpaid on November 21, 1974, bearing a slip with a notation "acct closed." On November 14, 1974, a check in the amount of $10,500, drawn by Trans-Agri Leasing, Mankato, Minnesota, in favor of M & R Truxs, Inc., was deposited in the M & R Trucking account. Immediate credit was given to M & R Trucking on this deposit. The check was in payment for two truck trailers sold by M & R Trucking to Trans-Agri Leasing. When it developed that M & R Trucking could not deliver clear title to the trailers, Trans-Agri Leasing stopped payment on the check.

As a result of the unpaid status of these two checks, the bank prepared a debit slip on November 22, 1974, charging the M & R Trucking account $23,000. Starting in October and November of 1974, the M & R Trucking account frequently was in an overdrawn status. Streett had led the bank officers to believe that M & R Trucking was

entitled to a substantial payment from Morgan Equipment. In mid-November of 1974, the assistant manager of the bank's industrial branch, Joe Lorang, had called Morgan Equipment and learned that a large payment had been sent.

On the morning of November 21, 1974, Viberg assisted Streett in depositing a check in the Donald J. Smith Transportation account by preparing a deposit slip for her in the amount of $34,728, which represented a check in that amount from Morgan Equipment. Viberg then prepared a counter check for her in the amount of $29,728 on the Donald J. Smith Transportation account payable to M & R Trucking. Streett signed the check and Viberg prepared a deposit slip in the amount of $29,728 in favor of the M & R Trucking account, and the proceeds of the counter check were credited to that account.

On that same morning of November 21, 1974, Smith received a $34,000 check from Morgan Equipment. He took the check to Halverson who informed him that payment had been stopped on the check. Smith called Morgan Equipment to confirm the stop payment and was informed that a second check had been issued and sent to the bank by the direction of Viberg. Smith confronted Viberg with this information the next day and Viberg indicated that he did not know anything about the check coming directly to the bank.

Smith brought suit against Halverson and the bank for tortious conversion of the $34,728 check from the Donald J. Smith Transportation account to the M & R Trucking account in order to cover the outstanding bad checks totalling $23,000. Halverson failed to appear and judgment was entered against him at the same time a verdict was directed in favor of the bank. Smith appeals from the judgment upon the directed verdict.

 Upon a motion for a directed verdict, the trial court must consider the evidence in the light most favorable to the nonmoving party and give the nonmoving party the benefit of every reasonable inference in his favor. The trial court must determine whether there is any substantial evidence to sustain the cause of action. If there is such substantial evidence that would allow reasonable minds to reach differing conclusions, the case must be submitted to the jury. *Lytle v. Morgan*, 1978, S.D., 270 N.W.2d 359. Upon review of the directed verdict in favor of the bank, we will view the evidence in the light most favorable to Smith. *Snell v. Watts*, 1959, 77 S.D. 534, 95 N.W.2d 453.

██ The record shows that the bank officers were apprised of the general terms of the business agreement between Smith and Halverson prior to the establishment of the checking account. Smith testified that he did indeed sign a white card at the bank when the account was opened. Regarding those authorized to sign on the account, the fact that Smith knew who Pat Streett was and knew she signed a vehicle inspection report for him does not imply that he authorized her to sign on the account or that he acquiesced in such signing.

Viberg denied that he personally handled the account based upon the fact that the account was at the Main Office while he was at the Industrial Branch. Marso, who assisted the parties in opening the account at the Main Office, testified that he looked to Viberg's knowledge of the account to a considerable extent because Viberg was very familiar with the parties involved. Lorang testified that some account activity was originated from the Industrial Branch because Viberg was personally handling the account.

During October and November of 1974, Halverson had outstanding debts to the bank totaling $169,000, and the evidence shows that Halverson's repayment performance was deteriorating and that Halverson's trucking account was frequently overdrawn. The bank was concerned and sought out Streett who assured the bank that a substantial amount of funds receivable was expected from Morgan Equipment. The evidence shows that Lorang called Morgan Equipment to confirm the fact. This indicates more than a mere passive interest on the part of the bank.

There is also evidence that in response to the bank's concern about Halverson's cash flow problems Smith and Halverson went to Viberg and showed him the six unpaid Morgan Equipment invoices totaling approximately $34,000. At that time, it was explained to Viberg that Halverson would be receiving roughly $3,000 from each of the invoice amounts for a total of $18,000 and that the balance of the $34,000 would belong to Smith. This conflicts with Viberg's testimony that he had no knowledge regarding who was entitled to the $34,000 check.

On November 8, 1974, Streett made a deposit in the M & R Trucking account of a personal check for $12,500 drawn on a bank in Waynesburg, Pennsylvania. The drawee bank in Pennsylvania refused to pay on the check and notified the First National Bank that the account was closed. The date of such notification is disputed. Lorang testified that he "planned to" have and he "could have" had a telephone conference with the Pennsylvania bank concerning this check. The evidence clearly shows that the bad check was received by the bank and the endorsement was cancelled by November 21, 1974.

On November 14, 1974, another check was deposited into the M & R Trucking account. This $10,500 check was drawn by Trans-Agri Leasing of Mankato, Minnesota. The drawee bank in Minnesota refused to pay on the check because the drawer had stopped payment on it. The date of notification of the stop payment order is also disputed. The check itself, which is in evidence, bears the telephone number of the First National Bank which is handwritten in ink. From this notation, the reasonable inference could be made that there was a telephone conversation between the drawee bank in Minnesota and an officer of the First National Bank regarding the stop payment order. In any event, the evidence shows that this bad check was also received by the bank and the endorsement was cancelled by November 21, 1974.

On November 21, 1974, Viberg assisted Streett in depositing the Morgan Equip-ment check for $34,728 in the Donald J. Smith Transportation account and transferring $29,728 of it to the M & R Trucking account. On that same day, the bank held bad checks totaling $23,000, which had been deposited into the M & R Trucking account. On November 22, 1974, Smith confronted Viberg and asked him if he had received the Morgan Equipment check. Viberg's reply was that he had not received anything there at the office. This reply carried the implication that the check had not yet arrived when, in fact, Viberg had personally seen to its deposit the day before.

The record is full of disputed facts and sufficient conflicting evidence which would allow reasonable minds to reach differing conclusions regarding either the bank's actual knowledge or bad faith. There is sufficient evidence to sustain the cause of action and the trial court was not justified in taking the issues of fact from the jury. We hold that it was reversible error for the trial court to direct a verdict in favor of the bank in that there were issues of fact that should have been submitted to the jury.

The judgment of the trial court is reversed and the case is remanded for trial.

ZASTROW and MORGAN, JJ., concur.

WOLLMAN, C. J., dissents.

PORTER, J., deeming himself disqualified, took no part in this decision.

WOLLMAN, Chief Justice (dissenting).

Appellant relies principally on the case of *Skinner v. First National Bank & Trust Co.,* 61 S.D. 481, 249 N.W. 821, in support of his contention that the evidence presented a jury question on the issue of the bank's liability for conversion. The holding in that case, however, has been largely vitiated by the adoption in 1943 of the Uniform Fiduciaries Act, SDCL 55–7–2 to 55–7–15. The purpose of the Act "was to facilitate banking transactions by relieving a depository, acting honestly, of the duty of inquiry as to the right of its depositors, even though fiduciaries, to check out their accounts." *Transport Trucking Co. v. First National*

*Bank,* 61 N.M. 320, 300 P.2d 476, 479. The Act relieves banks of their common law duty to inquire into the propriety of fiduciary transactions and permits them to indulge in the presumption that the fiduciary is acting lawfully and in accordance with his duties in withdrawing funds from the fiduciary account. *General Insurance Co. of America v. Commerce Bank of St. Charles,* Mo.App., 505 S.W.2d 454. In the words of the Nevada Supreme Court, "The Act was clearly meant to relax the standards of care owed by banks to principals and third parties when dealing with fiduciary accounts." *Guild v. First National Bank of Nevada,* Nev., 553 P.2d 955, 958. See also *Johnson v. Citizens National Bank of Decatur,* 30 Ill.App.3d 1066, 334 N.E.2d 295; *Sugarhouse Finance Co. v. Zions First National Bank,* 21 Utah 2d 68, 440 P.2d 869; 5A Michie on Banks and Banking, p. 172 (1973).

SDCL 55–7–2(2) provides:

(2) "Fiduciary" includes a trustee under any trust, express, implied, resulting or constructive, executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, agent, officer of a corporation, public or private, public officer, or any other person acting in a fiduciary capacity for any person, trust or estate.

SDCL 55–7–4 provides:

A person who in good faith pays or transfers to a fiduciary any money or other property which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary; and any right or title acquired from the fiduciary in consideration of such payment or transfer is not invalid in consequence of a misapplication by the fiduciary.

SDCL 55–7–8 provides:

If a check is drawn upon the account of his principal in a bank by a fiduciary who is empowered to draw checks upon his principal's account, the bank is authorized to pay such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith. If, however, such a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of its obligation as fiduciary in drawing or delivering the check.

I would hold that Patricia Streett was a fiduciary within the meaning of SDCL 55–7–2(2). She had signed a signature card for the Donald J. Smith Transportation account. One who is authorized to draw checks in the name of his employer is a fiduciary within the meaning of the Act. *Johnson v. Citizens National Bank of Decatur,* supra. Moreover, Smith knew that Ms. Streett had written checks on the account, yet despite his claimed protest to Halverson he did not alert the bank of her alleged lack of authority to write checks. In addition, Ms. Streett had prepared invoices for Smith and had been certified by him as a proper person to sign the vehicle inspection report described above.

Although the Uniform Fiduciaries Act does not define the term "bad faith," SDCL 55–7–3 states that "A thing is done 'in good faith' within the meaning of §§ 55–7–2 to 55–7–15, inclusive, when it is in fact done honestly, whether it be done negligently or not." As the Utah Supreme Court stated in the *Sugarhouse Finance Co.* case, *supra,*

The statute does not define "bad faith." However, it defines "good faith" as being done honestly, whether it is done negligently or not. "Bad faith" is the antithesis of good faith and has been defined in the cases to be when a thing is done dishonestly and not merely negligently. *Davis v. Pennsylvania Co., etc.,* 337 Pa. 456, 12 A.2d 66 (1940). It is also defined as that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest. *National Casualty Co. v.*

*Caswell & Co.,* 317 Ill.App. 66, 45 N.E.2d 698 (1943). 21 Utah 2d at 70, 440 P.2d at 870.

See also *General Insurance Co. of America v. Commerce Bank of St. Charles, supra; Guild v. First National Bank of Nevada, supra; Griffin v. Town of Pine Bluffs, Wyo.,* 368 P.2d 132.

When measured against the definition of bad faith set forth in the above cited cases, it is clear that the bank's conduct was not demonstrated by appellant's evidence to have been motivated by dishonest purpose or motive of self-interest. True, as it ultimately developed, the bank benefited in the sense that the $29,728 deposit in the M & R Trucking account on November 21, 1974, was offset against the $23,000 worth of dishonored checks charged back against that account, but appellant's evidence did not establish that Lee Viberg had knowledge at the time he assisted Ms. Streett with the transactions on November 21 that the two checks had been dishonored or that the M & R Trucking account was in fact in a badly overdrawn condition. Nor did appellant's evidence establish that Mr. Lorang's telephone call to Morgan Equipment was motivated by a desire to assist Ms. Streett in obtaining the $34,728 check for the purpose of wrongfully diverting into Halverson's account money due Smith. Smith concedes on appeal that Halverson was entitled to $18,090 out of the $34,728 check. Ms. Streett was clothed with apparent authority to negotiate checks payable to Smith. She was authorized to draw checks on the Donald J. Smith Transportation account, and there is no evidence in the record to support a finding that the bank had actual knowledge that she was committing a breach of her obligation as fiduciary in drawing the check or that it had knowledge of such facts as to make it guilty of bad faith. Although the finger of suspicion can be pointed at the bank in the light of after-the-fact circumstances, when measured against the knowledge the evidence establishes that the bank had on November 21, 1974, appellant's proof failed to present an issue of fact for the jury. Accordingly, I would affirm the judgment dismissing appellant's complaint against the bank.