RESEARCH–PLANNING, INC., a Utah corporation, Plaintiff and Appellant,

v.

BANK OF UTAH, Defendant and Respondent.

No. 18968.

Supreme Court of Utah.

Sept. 28, 1984.

Claron C. Spencer, Keith W. Meade, Salt Lake City, for plaintiff and appellant.

Glenn C. Hanni, Stuart H. Schultz, Salt Lake City, for defendant and respondent.

STEWART, Justice:

The issue is whether the Bank of Utah acted in bad faith by disbursing plaintiff's escrowed funds, which the plaintiff's escrow agent had deposited in its general checking account and which the Bank was unaware were deposited for escrow purposes.

On or about August 18, 1980, the plaintiff, Research-Planning, Inc., gave a $260,000 cashier's check to First Capital Mortgage Loan Corp. to hold in escrow for consummation of a real estate transaction between Research-Planning and R.K. Buie and Associates. The check was made out jointly to First Capital and R.K. Buie. On August 19, First Capital obtained R.K. Buie's endorsement on the check and deposited the check in its general checking account with the defendant, Bank of Utah.

Later that same day Steve Alder, an attorney for R.K. Buie, went to the Bank and spoke with Roger Barth, the assistant manager. Alder inquired whether the $260,000 check had been deposited to First Capital's account; Barth replied that it had been deposited. When Alder asked what the balance in the account was, he was told by Barth that that information was confidential. Alder then informed Barth that the $260,000 was to be used for a "specific purpose," but did not elaborate on or provide any details. Barth told Alder that the money had been deposited into First Capital's general checking account and that the Bank would pay checks drawn on the account on a first come, first served basis. Alder requested Barth to call if any questions or problems arose with the First Capital account. Barth replied that he would and took Alder's phone number.

After verifying the validity of the cashier's check and R.K. Buie's endorsement, the Bank on August 19 paid seven checks drawn on the First Capital account. The checks totaled $214,164.61. The Bank had been holding some of the checks for collection; three were cashier's checks issued to other banks. Upon payment of these checks, the balance in First Capital's account fell below $260,000.

Late in the day, a $250,000 check drawn on First Capital's account was presented for payment. The check was to close the deal between Research-Planning and R.K. Buie, both of whom believed that the $260,000 deposited earlier that day was still in the account. Faced with a possible overdraft, the Bank refused to honor the check and placed a "hold" on First Capital's account. The Bank subsequently disbursed all the remaining funds in First Capital's account to pay other smaller checks. The $250,000 check was never honored.

Research-Planning sued the Bank, alleging that it had wrongly disbursed the $260,000 in violation of the duty that banks have toward fiduciaries as declared in U.C.A., 1953, § 22–1–9, part of the Uniform Fiduciaries Act. That section states in relevant part:

Deposits in fiduciary's personal account. —If a fiduciary ... makes a deposit of funds held by him as fiduciary, the bank receiving such deposit ... is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank ... pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary ..., or with knowledge of such facts that its action in ... paying the check amounts to bad faith.

Research-Planning attempted to show at trial that because of Alder's conversation with Barth, the Bank had reason to believe that Capital Mortgage acted as a fiduciary in depositing the $260,000 as escrowed funds and therefore the Bank acted in bad faith when it paid out part of the $260,000 to honor various checks written by Capital Mortgage on the account.

The trial judge found that the Bank had neither actual nor constructive knowledge of the purpose for which the $260,000 was intended. His findings state:

20. The Bank had no knowledge of the specific use for which the $260,000.00 was intended. The Bank also had no knowledge of the purpose for which First Capital actually used the $260,000.00 drawn from its checking account.

. . . .

24. Neither Mr. Alder nor anyone else told the Bank that the $260,000.00 was to be transferred by First Capital in the form of one check to a title company

where the real estate transaction was scheduled to be closed.

25. When the Bank paid checks drawn on First Capital's checking account on and after August 19, 1980, the Bank had neither actual knowledge nor constructive knowledge that First Capital, by making draws on its general checking account, was misappropriating funds held by First Capital as a fiduciary or that First Capital was breaching its fiduciary relationship.

The trial court stated: "An action is done in bad faith when it is done dishonestly." Based on that definition of bad faith and the above findings, the trial court concluded that "[t]he Bank did not act in bad faith or dishonestly when it paid checks drawn on First Capital's general checking account on and after August 19, 1980." On appeal, Research-Planning does not challenge the trial court's conclusion that the Bank lacked actual knowledge. Research-Planning does, however, challenge the definition of bad faith applied by the trial court in ruling that the Bank had not acted in bad faith.

The Uniform Fiduciaries Act does not define "bad faith," although it defines "good faith" as a thing done honestly, whether or not done negligently. § 22–1–1. The trial court's definition of bad faith was apparently taken from *Sugarhouse Finance Co. v. Zions First National Bank*, 21 Utah 2d 68, 440 P.2d 869 (1968). In *Sugarhouse Finance*, we stated:

> "Bad faith" is the antithesis of good faith and has been defined in the cases to be when a thing is done dishonestly and not merely negligently. *Davis v. Pennsylvania Co.*, 337 Pa. 456, 12 A.2d 66 (1940). It is also defined as that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest. *National Casualty Co. v. Caswell & Co.*, 317 Ill.App. 66, 45 N.E.2d 698 (1943).

*Id.* at 70, 440 P.2d at 870. *Accord Braswell Motor Freight Lines, Inc. v. Bank of Salt Lake*, 28 Utah 2d 347, 349, 502 P.2d 560, 562 (1972). Thus, the definition of bad faith set out in *Sugarhouse Finance* requires more than negligence.

■ *Davis v. Pennsylvania Co.*, 337 Pa. 456, 460, 12 A.2d 66, 69 (1940), cited in the above quotation from *Sugarhouse Finance*, states the standard for distinguishing between negligence and bad faith:

> At what point does negligence cease and bad faith begin? The distinction between them is that bad faith, or dishonesty, is, unlike negligence, wilful. The mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith (*Union Bank & Trust Co. v. Girard Trust Co.*, 307 Pa. 488, 500, 501, 161 A. 865), unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction,—that is to say, where there is an intentional closing of the eyes or stopping of the ears.

*Accord Trenton Trust Co. v. Western Surety Co.*, Mo., 599 S.W.2d 481, 492–93 (1980); *Edwards v. Northwestern Bank*, 39 N.C.App. 261, 268, 250 S.E.2d 651, 656–57 (1979); 5A *Michie on Banks and Banking* § 57b, at 194–96 (1983). *See also Johnson v. Citizens National Bank*, 30 Ill.App.3d 1066, 334 N.E.2d 295 (1975); *Transport Trucking Co. v. First National Bank*, 61 N.M. 320, 325, 300 P.2d 476, 479 (1956) (mere suspicious circumstances not enough to require inquiry by bank). *See generally* Unif. Fiduciaries Act § 9, 7A U.L.A. 151–58 (1978 & Supp.1984); Annot., 114 A.L.R. 1088 (1938). Thus, bad faith requires willfulness; simple negligent conduct by itself is not a sufficient basis for liability.

■ This definition of bad faith reflects the development of the law regarding the duty of banks in dealing with fiduciaries. Prior to enactment of the Uniform Fiduciaries Act, U.C.A., 1953, § 22–1–1 et seq., the common law imposed on banks dealing with fiduciaries the duty of properly applying fiduciary funds to the account of the principal. *Sugarhouse Finance Co. v. Zions First National Bank*, 21 Utah 2d

68, 70, 440 P.2d 869, 870 (1968). In some cases the courts went so far as to hold a depository bank chargeable with constructive notice of a fiduciary's misconduct. Scott, *Participation in a Breach of Trust,* 34 *Harv.L.Rev.* 454, 476–80 (1921). The purpose of the Uniform Fiduciaries Act was to relax the harshness of the rule requiring the highest degree of vigilance in detecting a fiduciary's wrongdoing. *Johnson v. Citizens National Bank,* 30 Ill. App.3d 1066, 1070, 334 N.E.2d 295, 298 (1975).

Research-Planning argues that bad faith exists when a bank remains passive in the face of known facts clearly suggesting fiduciary misconduct. It cites negotiable instrument cases and contends they are controlling because, it argues, the drafters of the Uniform Fiduciaries Act intended to adopt the definition of bad faith from negotiable instrument law. *See, e.g., Trenton Trust Co. v. Western Surety Co., supra,* 599 S.W.2d at 492.

■ Even if the definition of bad faith in negotiable instrument law were intended to apply to the Uniform Fiduciaries Act and somehow modify *Sugarhouse Finance,* a question which we do not decide, the evidence was not sufficient to show bad faith under either that standard or the standard stated in *Sugarhouse Finance.*[1] The Bank neither acted with actual knowledge that First Capital acted as a fiduciary in depositing the $260,000 or in bad faith, nor can it reasonably be charged with having ignored any knowledge that indicated that the Research-Planning check constituted fiduciary funds. It did not have in its possession

"facts clearly suggesting fiduciary misconduct."

The account into which the $260,000 was deposited was a general, not a fiduciary, account. The $260,000 check was a cashier's check, not a trust account check. It did not indicate that First Capital had a fiduciary duty associated with the deposited funds. As a result of Barth's conversation with Alder, the Bank knew only that the $260,000 was to be used for a specific purpose. It did not know what the purpose for the deposit was, nor have reason to believe that First Capital was acting as an escrow agent and that the $260,000 were escrowed funds. Barth's testimony supports the trial judge's finding that the bank was not guilty of bad faith.

■ Research-Planning also argues that the Bank is estopped because of Barth's statement that he would call Alder if there were problems with the account. That language is not sufficient to work an estoppel. What the case would have been had Alder told Barth what First Capital's deposit was, we need not decide.

Affirmed. Costs to respondents.

HALL, C.J., and HOWE, DURHAM and ZIMMERMAN, JJ., concur.

---

1. Although Research-Planning argues that the definition of bad faith should be the same under the Uniform Fiduciaries Act as it is for negotiable instrument law, it has cited no statutory or case authority indicating how bad faith is defined under Article 3 of the U.C.C. (U.C.A., 1953, § 70A–3–101 et seq.), which governs negotiable instruments. Since no relevant cases have been cited on the issue, we decline to decide whether the definition of bad faith in negotiable instrument law should apply to the Uniform Fiduciaries Act.